The State v. Stout.

---

No. 24,534.

THE STATE OF KANSAS, *Appellee,* v. FRANK STOUT, *Appellant.*

SYLLABUS BY THE COURT.

1. MURDER IN FIRST DEGREE—*Instructions on Inferior Degrees Waived by Failure to Request Them.* Proceedings resulting in conviction of murder in the first degree considered, and held, instructions on inferior degrees of homicide were waived by defendant's failure to request them; and there was no lapse from soundness or regularity of procedure, and no repugnancy to fairness in consequence, which authorizes this court to ignore the waiver.

2. SAME—*Voluntary Statements Made by Defendant Prior to His Arrest Properly Admitted in Evidence.* Defendant was questioned at length and several times before he was arrested, concerning events and circumstances relating to the homicide. His voluntary statements were taken stenographically, and were introduced in evidence at the trial as part of the state's case in chief. Major portions of the statements were relevant and material. Other portions were simply immaterial and without probative value. Material portions contradicted each other in important details. *Held,* failure to exclude immaterial portions was not prejudicial, and the statements were admissible, notwithstanding they disclosed defendant's connection with and activities in the business of selling stolen automobiles, and tended to destroy confidence in his veracity before he had opportunity to take the witness stand in his own behalf.

3. SAME—*Adequate and Correct Instructions Relating to Circumstantial Evidence were Given.* The degree of conclusiveness required of circumstantial evidence in order to warrant conviction was adequately expressed by an instruction that, if from the evidence the jury had no reasonable doubt of defendant's guilt, and the evidence pointed to that single conclusion, the jury should return a verdict of guilty.

4. SAME—*Assignments of Error Without Merit.* Various assignments of error considered, and held to be without merit.

Appeal from Lyon district court; WILLIAM C. HARRIS, judge. Opinion filed November 10, 1923. Affirmed.

*W. N. Smelser, W. S. Kretsinger, O. T. Atherton, R. M. Hamer,* and *W. C. Roberts,* all of Emporia, for the appellant.

*C. B. Griffith,* attorney-general, *John F. Rhodes,* assistant attorney-general, *Roland Boynton,* county attorney, and *Owen S. Samuel,* of Emporia, for the appellee.

The opinion of the court was delivered by

BURCH, J.: Frank Stout was convicted of murder in the first degree for killing Clyde Walno, and appeals.

The conviction rested on circumstantial evidence. The evidence was voluminous, and cannot be reproduced here. Abridgment and summarization are not only difficult, but would likely be unsatisfactory to counsel who, because of the nature and importance of the case, attach great weight to minute details. Therefore, the statement of the case is to be regarded as scaffolding from which to discuss the assignments of error, erected from facts, inferences from facts, and testimony derivable from the record.

Stout was a taxi driver at Emporia, employed by Rupert Thayer to drive a seven-passenger Paige automobile at night. The car was capable of making sixty miles per hour, and Stout was a fast driver, but a good driver. Walno lived with his parents on a farm eight miles northwest of Emporia. Walno was twenty-three, Stout was twenty-one, and the two were on friendly terms.

Stout was engaged in disposing of stolen automobiles. Walno learned Stout had access to good cars at low prices, and was eager to take advantage of the opportunity to secure a desirable car. On August 12, 1921, Walno gave Stout a check for $800, which Stout cashed on August 15. On August 13 Walno borrowed $700 at the bank, and after the Stout check came in his balance was $336.68. On August 25, Walno borrowed $600 at the bank, was credited with the proceeds, and was given a cashier's check for $600. The next day Walno and Stout were in Kansas City together. Walno cashed the cashier's check there, and purchased a stolen Buick car. According to Stout, he went with Walno to Kansas City, was with him when he purchased the car, and returned to Emporia with Walno in the car.

The check for $800 was given to Stout for a Cadillac roadster which Walno was to receive. It was understood' delivery of the roadster might be delayed. While it was coming, Walno could be using the Buick, which was readily salable.

On the evening of September 6, Walno drove from the farm to Emporia in the Buick car. He told his parents he was going to Kansas City to buy a Cadillac car, and that Stout had agreed to buy the Buick car. Walno spent some time with Stout in Emporia the night of the 6th, and the morning of the 7th took an early train

to Kansas City, where he expected to receive the roadster. He intended to drive it home, and to take with him a mechanic to overhaul a tractor engine on the farm. At Kansas City, Walno arranged with McCollom, a mechanic, to leave at 2:30 p. m. About that time he told McCollom his car was not in, or he could not get his car, and arranged to leave at 10 o'clock that night. At 4:25 p. m., Stout at Emporia called Walno, by telephone at the Washington hotel in Kansas City. At 5:51 p. m. the call was completed, and Stout told Walno his car was at Emporia. Walno then told McCollom they would have to go to Emporia by train. McCollom's expenses were to be paid. Walno was short of funds, failed to get a check cashed, and McCollom paid his own railroad fare to Emporia.

Walno and McCollom arrived at Emporia about 2:30 a. m. of the 8th. Stout was at the station, told Walno it had rained and the roads were very slippery, and advised Walno to wait until morning to go home. Walno and McCollom went into the National hotel near the station, registered, and were assigned to the same room. Stout went with them, had a private conversation with Walno, and went out of the hotel. McCollom suggested to Walno they have a piece of pie and, when they had eaten, Walno excused himself, saying he wanted to see a man outside. McCollom went to the room and to bed. According to Stout, Stout told Walno in the hotel his car was there, and when Walno came out of the hotel after eating, he gave Walno a bill of sale and the keys for the Cadillac roadster which had been parked near the hotel since some time in the afternoon. Stout said that later in the night he saw Walno driving the car down the street, and later saw him by the car with a man whom Walno introduced as Longshore, from Oklahoma City. As the narrative proceeds, it will be interesting to note how Stout creates characters who appear briefly upon the stage of the tragedy, and are never seen again.

After leaving McCollom, Walno did not return to the hotel. When morning came, McCollom went to the farm, and told Walno's father, E. A. Walno, his son was missing.

The morning of the 8th, Stout called Thayer by telephone, and said he was near the Cushmall farm, about five miles from Emporia, on the west road to Allen, and was out of gasoline. Allen is a half mile east and eighteen miles north of Emporia. Thayer took out gasoline, and Stout told him of taking a passenger to Allen. They reached Emporia about 9 o'clock.

In the forenoon of the 8th, E. A. Walno went to town, went to Stout's house, told Stout his son was missing, and wanted Stout to help find him. Stout was in possession of the Buick car. He told E. A. Walno he had bought the car and paid $800 for it, which he counted out in cash in the depot the morning Clyde took the train for Kansas City.

In the forenoon of the 10th, Clyde Walno's dead body was found at the side of a culvert some five miles east of Emporia, on the road to Neosho Rapids, which is also the road to Kansas City and to Tulsa, Okla. The body was lying on its back, with the feet bent back under the hips. He had been shot in the right nostril. The bullet took a horizontal or slightly downward course, and came out at the back of the head, near the base of the brain. There was a contused mark on the forehead. His cap was lying on his chest, as if it had been placed there. Near his head was a wadded, bloody handkerchief. In his pocket were a letter and a telegram to Stout, written while Walno was in Kansas City, but not forwarded. The letter said he was in Kansas City to make the deal, but had not seen his man yet, and the telegram asked Stout to wire him ten dollars. He had no money except some small change. There were no footprints about the place where the body was found, and the body had been dropped over the three-foot banister of the culvert.

On September 11, a police officer inspected the Paige car Stout was driving the night Walno disappeared. The car was watched from September 12 to September 14, and on September 14 it was thoroughly examined by the sheriff and others. On the leather upholstering at the right of the rear seat was a spot as large as a man's hand, which had been cleaned, but a stain at the outline of the spot had not washed out. Small spots were found on the front seat and the board under the front seat. The discolored portions of leather and wood were removed, and were subjected to scientific tests which demonstrated the spots and stains were made by human blood. The day of Walno's disappearance Stout turned the car over to Thayer. It was not washed after Thayer received it. Thayer made the statement it had not been used after he received it, but the evidence on the subject was not clear.

There was evidence the Cadillac roadster was seen near the depot in Emporia the afternoon of the day Walno was in Kansas City. Stout said he was called by telephone shortly after 3 p. m., by some one who said he had a car Walno sent down. Stout went to the

depot, and met a short, slim boy, about sixteen or seventeen years of age, standing in front of the National hotel, who said he had been instructed to deliver the keys and bill of sale of the car to Stout, whom he recognized by description. The boy said he was told to go to the Washington hotel in Kansas City, and in case Walno were not there, to deliver the car in Emporia. The boy said Walno bought the car of his father. The boy did not reveal his name. He delivered the keys and bill of sale to Stout, removed the Missouri number from the car, said he was going to the depot, and vanished.

The state produced testimony that no Cadillac roadster was seen about the hotel or station. All the circumstances considered, the preponderance of the evidence probably was that Stout's telephone message to Walno in Kansas City stated the truth, and the car was taken to Emporia. What became of it nobody knows but the driver and Stout. However, shortly before 5 o'clock the morning of the 8th, a traveler turning south from the Neosho Rapids road at a point five miles west of Neosho Rapids, saw a car coming from the direction of Emporia. As the car approached, its lights were turned out. At 5 o'clock the postmaster of Neosho Rapids was awakened by a rapidly driven automobile, which was not following the main road through the main street of the town, and which struck a casting on the corner of a culvert, making a loud noise.

To account for the $800 which Walno gave Stout to pay for the roadster, Stout said Walno instructed him to give the money to George Schwilling, of Kansas City, and he gave the money to Schwilling in currency, at the Muehlebach hotel in Kansas City. He did not know how Walno became acquainted with Schwilling. Afterwards, Schwilling sent the money back to Walno by certified check, stating he was not able to fix Walno up. Walno showed Stout the check and letter. That was about August 24 or 25, and before Walno borrowed $600 and went to Kansas City to buy the Buick. No such check was ever cashed at any bank in Emporia. Walno made no deposit in the bank after depositing the proceeds of the note for $600. He was in need of money when in Kansas City. When his body was found he had no money on his person, and he still owed two notes at the bank, one for $700 and one for $600.

Stout said that when Walno bought the Buick car, it stood on a street in Kansas City, Kan., with a "For Sale" sign on it. Walno paid $700 or $710 for it. Stout agreed to pay Walno $800 for it, and expected to sell it for $1,000 on payments. Stout gave the following

remarkable account of how he obtained part of the money to pay Walno:

"When Clyde came in Tuesday evening he asked me for the money for the Buick, and I told him I did not have that much cash. He suggested I give him a check. I told him I would give him a check, but that it would not be good. This conversation was in the evening. He did not turn the car over to me at that time. He was riding around in the car. He turned it over to me in the morning when he got ready to go, which was about 4 o'clock in the morning. He had asked me for the cash about 10 o'clock the evening before. I saw him off and on from that time until he left. I did not know where he was all the time. I do not know where he was from midnight until 4 o'clock in the morning. He had the Buick car with him. I told him if he wanted to wait until after the bank opened I could give him the cash. He told me at that time he had to go to Kansas City that night. At about 1 o'clock that night I told him I had raised the money and could pay him the cash. He asked me to keep it until train time. Schwilling came to Emporia that night; he saw me at the depot. . . .

"When I first saw Schwilling he was standing in the depot. He hallooed at me as I got out of my car and started into the hotel. He started toward me, and I started toward him. We had some conversation, and he said, 'I have some money for you.' I said, 'What money is that?' and he said, 'Some money I owe you.' I said. 'You don't owe me anything,' and he said, 'I owe you $642.' I said, 'Well, I didn't know it if you did.' He said, 'I do,' and he paid it."

.      .      .      .      .      .      .      .      .      .      .      .      .      .

"Q. Schwilling paid you that for selling cars? A. Yes, sir.
"Q. What kind of cars? A. Some Studebakers, some Buicks, and one Nash.
"Q. How many Studebakers? A. Two, one Nash, and three Buicks.
"Q. Your commission for selling all these cars was $642? A. Yes."

.      .      .      .      .      .      .      .      .      .      .      .

"After he paid the money, I presume he took the train out."

The remainder of the money was accounted for with equal facility, and the denominations of the bills given to Walno shortly before he took the train to Kansas City, were enumerated.

When Stout went on duty with the Thayer car about 9 o'clock the night Walno returned from Kansas City, it had between five and nine gallons of gasoline in the tank. The car would make from ten to twelve miles on a gallon of gasoline. The road distance from Emporia to Allen, by way of the place where Walno's body was found, and then to the place where the car stopped for want of gasoline, is fifty-six miles. Stout told Thayer he would have been "blown up for the turn-in" without the fare of the passenger to Allen. This passenger was a cattleman from Mexico, who dropped off the train at Emporia, and wanted to go to a pasture with no cattle visible in

it, at 4 o'clock in the morning, over roads too slippery for Walno to travel, to meet some men who did not appear. Stout said he took the man from the pasture to Allen and left him there, where nobody saw him, although the town was agog over a store robbery which occurred in the night. Allen is reached from Emporia by a good, direct road, known as the east road. Stout gave a false explanation for returning by the west road, which was nearly impassable in places, and gave false, contradictory, and unverifiable accounts of details of the trip.

On September 9, Stout was questioned by an attorney employed by E. A. Walno, and on the 10th and 12th by the county attorney. His statements, which were taken stenographically, covered his activities in the "hot car" business, and all the circumstances leading up to and connected with Walno's disappearance. He willingly responded to questions, with equal frankness and mendacity, but with such cunning that, after skilled cross-examiners had grilled him three times, they were without clue from him relating to the homicide. His inventive faculty, however, outran his faculty for congruity, and he became hopelessly entangled in the meshes of his own fabrications.

In this state, any kind of willful, deliberate and premeditated killing is murder in the first degree. Murder committed maliciously, but without deliberation and premeditation, is murder in the second degree. Defendant was charged with the higher crime. The court in its instructions submitted to the jury first-degree murder only, and the alternatives were, guilty as charged, or acquittal. Error is assigned because the court did not instruct the jury concerning murder in the second degree, and manslaughter.

The statute requires the court to state to the jury all matters of law necessary for their information in giving their verdict, and the verdict must specify the degree of the offense of which defendant is found guilty. In the case of *The State v. Winters*, 81 Kan. 414, 105 Pac. 516, it was held this statute prescribes a rule of criminal procedure, benefit of which defendant may waive, and generally error in failing to instruct on lower degrees is waived by failing to request instructions concerning them. In this instance, the giving of instructions on lower degrees of homicide was clearly waived. None was requested. Besides that, failure to give such instructions was not made a ground for new trial in the motion for new trial, and when the motion for new trial was presented, the attention of the district court was not called to the subject.

In the Winters case, an exception to the rule of waiver was recognized. It was said the evidence may point so plainly to necessity for instructions on lower degrees that no formal request is necessary, and if conviction of a higher degree rest on unsatisfactory evidence which clearly required instructions concerning lower degrees, omission to give the instructions will be regarded as prejudicial error. (p. 421.) As the statement of the exception indicates, it was allowed for exceptional cases only. It is not enough that upon appeal a defendant may be able to persuade this court the evidence warranted instructions on inferior degrees. Benefit of proper instructions is what defendant waives unless he request the district court to give them; and this court will not ignore the waiver unless propriety of the instructions should have been manifest to the district court, and omission to give them probably resulted in a miscarriage of justice. We have no such case here.

The circumstances of Walno's disappearance and the disposition of his dead body indicate felonious homicide, and the fatal wound indicates deliberation and premeditation in its infliction. The contusion on the forehead may have been made in a fight. It may have been made in disposing of the corpse. However it was made, there was no evidence it caused death, and the bullet was fired into Walno's right nostril. The coroner testified, "I found a wound in the right nostril." The undertaker testified, "We found a bullet wound entering the right nostril." Another witness testified he ran a metal probe through the wound, "from the nostril through the head, coming out at the base of the brain." The fleshy part of the nose was not mentioned. The probability of a bullet fired from a distance entering the nasal orifice, passing horizontally or somewhat downward through the head, and coming out at the base of the brain, is remote; and the evidence which this court is asked to review warrants an inference the weapon used was deliberately and premeditatedly placed, and then discharged.

There is no evidence in the record that the roads were in fact in a condition to make it difficult or inconvenient for Walno to go home at once after he arrived in Emporia from Kansas City, as he intended to do. According to Stout, an hour and a half after he had told Waldo the roads were slippery and he had better stay until morning, Stout unhesitatingly started for Allen. He testified the roads were fair and he made average time. Thayer made no complaint of the road to Cushmall's farm north of Emporia, in the gen-

eral direction Walno lived.  Therefore, Stout purposely detained Walno in Emporia to accomplish some design.

The Cadillac roadster business had reached culmination.  Although he was expecting to receive the car, Walno was not expecting to pay for it, had no money with which to pay for it, and had given Stout $800 with which to pay for it.  Stout's account of the return of the money was transparently false.  If Walno were dead he never would have to account for it.  Stout had agreed to buy Walno's Buick.  Stout's account of paying for the Buick was transparently false.  With Walno dead Stout could keep the Buick without paying for it; and within an hour after Walno arrived in Emporia from Kansas City, he was killed.

At noon of the day Walno was missing, his father took Stout to dinner.  In the course of conversation the elder Walno said something foul had happened to his boy, and it looked as if he had been murdered.  Stout said, "It begins to look that way," and said he had been told there were men in Kansas City who would go anywhere in the United States and kill a man for $50.  If a professional gunman placed the pistol muzzle in Walno's nostril, the deed was worth much more money than $50, to Stout.

Responsibility for the murder prompted disposition of the body, and Stout, alone or with a confederate, placed the body in the Paige car, drove out of town with it, and brutally dropped it over the side of the culvert.  The trip to Allen was a crude attempt to manufacture an alibi.

The rule that, to warrant conviction, circumstantial evidence must be inconsistent with any reasonable hypothesis except guilt of the accused, is a rule of trial procedure, and not a rule of appellate procedure.  The jury decides between hypotheses, and the function of this court is limited to ascertaining if there was evidence to support the hypothesis adopted.  In this instance, there was evidence from which the jury might reasonably infer defendant was guilty as charged.

The record discloses the case was tried twice.  At the first trial, the court instructed in reference to murder in the first degree only.  Therefore, the trial court's settled judgment was, the evidence required a finding either that Stout did not participate in the homicide and was innocent, or that he was guilty.  Counsel for defendant acquiesced in that view until after they had appealed and had printed their abstract of the record for this court.  The assign-

ment of error under consideration was then interlined. Conceding, for purposes of the decision, the court would not have erred against the state if it had given instructions on lesser degrees of homicide, there was no lapse from soundness or regularity of procedure, and no repugnancy to fairness in consequence, which authorizes this court to ignore the waiver.

.The statements Stout made when he was questioned prior to arrest, were introduced in evidence as a part of the state's case in chief. It is contended portions of the statements were not material, which is true. What Stout did with $800 of Walno's money was important. How Stout came by Walno's Buick after Walno's death, was important. Stout's explanations opened the subject of traffic in stolen cars, which formed the web on which the pattern of the crime was woven. It was inevitable the examination should take wide range, and many features and incidents of his activities were developed. Some immaterial fringes and fragments of the statements might have been sheared off without cutting into the fabric of the important. Those portions of the statements, however, were not hurtful to the defendant. They were merely immaterial, or without probative value, but they were not prejudicial in the legal sense. In his examinations defendant was continually steering between and around and away from incriminating facts, and was trying to invent a set of facts which would exculpate him. The trip to Allen is an illustration. He was tracked to the end of every trail, and inconsequential matters were elicited. They were, however, merely inconsequential, and omission to take them from the jury did not constitute prejudicial error.

The various statements which Stout made contradicted each other in important details, and the contention is, the state blackened his character and destroyed confidence in his veracity before he had opportunity to take the witness stand in his own behalf. The stolen-car business was relevant and material. Being so, its admissibility was not affected by the fact it was also disreputable, and false and contradictory statements of one charged with crime, concerning material matters, are admissible in evidence, notwithstanding the effect on his credibility.

The evidence relating to blood stains is discussed at length in defendant's brief. To review the evidence would require an extension of this opinion beyond proper limit, and the court must content itself with saying the principal objections urged against the evidence go to its weight and not to its admissibility.

Defendant complains because the court refused his 4th, 5th and 7th requests for instructions relating to circumstantial evidence.

The 4th instruction was that a few facts or a multitude of facts consistent with guilt are not enough to warrant a verdict of guilty and, in order to convict on circumstantial evidence, the circumstances must not only concur to show that defendant committed the crime, but they must be inconsistent with any other rational conclusion. Considered critically, the first part of the instruction is fallacious. "Few" and "multitude" refer to number. Grammatically and logically, "enough" refers to number, not to conclusiveness, and the thought is, a few facts, or a multitude of facts, consistent with guilt, are not enough in number to warrant a verdict of guilty—which is not true. The sentence, therefore, is merely an awkward introduction of the subject of conclusiveness, which is covered by what follows.

The two substantive propositions of the second part of the instruction are, consistency with guilt, and inconsistency with innocence. Concurrence of facts relied on to show defendant committed the crime is no more essential in a circumstantial evidence case than in any other case and, if the jury be told anywhere in the instructions that the evidence must establish defendant's guilt beyond a reasonable doubt, the first proposition is satisfied. This was done.

The statement that circumstantial evidence relied on for conviction must be inconsistent with any rational conclusion except that defendant committed the crime charged, expresses the requirement of conclusiveness in one way. Another way would be to say the circumstances must be incapable of explanation on any rational hypothesis except guilt; and there are many other correct forms of expression. While much verbosity and tautology have been employed in expounding it, the essence of the whole matter is that, in order to convict on circumstantial evidence, there must be but one reasonable conclusion derivable from it, the conclusion of guilt.

The 5th instruction was that, when a fact or circumstance tends equally to support theory of guilt and theory of innocence, it is the duty of the jury to regard the fact or circumstance as in favor of innocence. The instruction was abandoned when the motion for new trial was presented. However, standing alone, the instruction is unsound because, in circumstantial evidence cases, facts and circumstances are not appraised singly as to consistency with guilt or innocence. They take their final rank and color from connection and association with others.

The 7th instruction was a refused instruction, copied from the case of *Colbert v. State,* 125 Wis. 423. The court said it contained a "substantially" correct statement of the law, and should have been given, because it contained directions not included in the general charge. The real ruling therefore was, the general charge was not adequate because some essentials were not embraced. The instruction need not be reprinted or analyzed here, because the important matter is whether the instructions given in the case under decision sufficiently and correctly stated the law.

A portion of the instruction regarding circumstantial evidence which the court gave follows:

"You should make such just and reasonable inferences from the evidence, circumstantial and direct, which the judgment of a reasonable man would make under like circumstances, and if in connection with all the evidence before you, you have no reasonable doubt of the defendant's guilt, and the evidence points to that single conclusion, you should return a verdict of guilty as charged."

The principal criticism of the instruction follows:

"The jury was not told that the circumstances should point to the single conclusion of the defendant's guilt beyond a reasonable doubt and to a moral certainty. Nor was the jury told that the circumstances must be incapable of explanation upon any other reasonable hypothesis."

Satisfaction of guilt beyond a reasonable doubt was specifically mentioned, was specifically mentioned again in the same instruction when the link and chain subject was discussed, and was reiterated time and again throughout the instructions. Reasonable doubt was well defined in a separate instruction, and the addition here of "to a moral certainty" was unnecessary. The direction that the evidence should point to the single conclusion of defendant's guilt beyond a reasonable doubt, fulfilled the requirement that circumstantial evidence must be incapable of explanation on any reasonable hypothesis except guilt. The result is, the instructions given were correct and adequate and, because they were so, denial of the requests for instructions was not prejudicial.

Out of a paragraph of the instruction devoted to discussion of the link and chain subject, defendant selects for criticism a single sentence: "It is not a reasonable doubt of one proposition of fact in the case that entitles to an acquittal." This method of criticism has been condemned many times. The sentence did not refer to an essential ingredient of the crime, and the discussion as a whole was unexceptionable.

State Bank v. Rummel.

It is apparently suggested that, by an instruction given the jury during its deliberations, defendant was deprived of the individual judgment of each juror. The subject was specifically covered by the general charge. It is said· the court's definition of murder in the first degree was not correct. The court merely introduced the subject of the nature of the crime charged by the definition referred to, and immediately proceeded to specify the statutory ingredients of murder in the first degree. Other assignments of error are without substantial merit.

The judgment of the district court is affirmed.