No. 24,171.

THE STATE OF KANSAS, *Appellee,* v. WILLIAM ELFTMAN, *Appellant.*

SYLLABUS BY THE COURT.

1. MURDER—*Defendant's Wife—Appearance of Deceased and Surroundings When Body Was Found.* Defendant was convicted of murder of his wife. Her dead body was found in the nighttime at the foot of the stone steps at the kitchen door of their home. She had suffered a slight contusion on her nose, a larger contusion on her left arm, two scalp wounds on the left side of the head, a compound comminuted fracture of the skull at the back of the head, and the tissues below the place where the skull was crushed were reduced to pulp. The state produced no witness who saw the wounds inflicted, and defendant claimed that when they were inflicted he was in bed and asleep. The evidence considered, and held sufficient to sustain the conviction.

2. SAME—*Information Was Sufficient.* The information charged murder by means of a blunt instrument, a more particular description of which the

The State v. Elftman.

county attorney was unable to give. The state was not able to identify any particular blunt instrument with which the wounds had been inflicted. *Held*, the information was sufficient.

3. SAME—*Motion for Change of Venue Properly Denied—Challenge of Jurors Properly Overruled.* The proceedings considered, and *held*, a motion for change of venue on account of prejudice of the district judge was properly denied, and challenges of certain jurors were properly overruled.

4. SAME—*Opinions of Doctors Respecting the Manner in Which and Means by Which the Wounds Were Inflicted—Admissible.* The theory of the state was that the fatal wounds were inflicted by repeated blows of a blunt instrument. The theory of the defendant was they were caused by an accidental fall on the stone steps. *Held*, opinions of doctors who examined the wounds and examined the stone steps, respecting the manner in which and the means by which the wounds were inflicted, were admissible.

5. SAME—*No Error in Rulings on Evidence.* Rulings respecting admission and rejection of evidence considered, and held to be correct.

6. SAME—*Limiting Number of Character Witnesses Not Error.* The proceedings considered, and *held*, the court did not abuse its discretion in limiting the number of defendant's character witnesses to ten.

7. SAME—*Instruction Relating to Good Reputation of Defendant.* An instruction to the jury, that if they concluded defendant had borne a good reputation it would require a greater degree of certainty of proof in order to convict than would otherwise be necessary, was properly refused.

8. SAME—The instruction which the court gave on the subject of character evidence was correct and adequate.

Appeal from Leavenworth district court. JAMES H. WENDORFF, judge. Opinion filed June 7, 1924. Affirmed.

*B. F. Endres,* and *A. E. Dempsey,* both of Leavenworth, for the appellant.

*Charles B. Griffith,* attorney-general, *Malcolm McNaughton,* county attorney, and *James B. Kelsey,* of Leavenworth, for the appellee.

The opinion of the court was delivered by

BURCH, J.: Defendant was convicted of murder of his wife, and appeals.

About 11:30 o'clock on the night of November 3, 1920, the dead body of Mrs. Elftman was found by the stone steps at the east door of the kitchen of the Elftman home. The back of her head had been crushed, there were two wounds on the left side of the head, a bruise on the nose, a bruise on the left arm, and there was much blood about the place where her head was lying. The family consisted of husband and wife, three sons, and a daughter. Durward was eighteen years old, Ruth and Russell, who were twins, were

fifteen, and Glenn was about seven. The body was discovered by Ruth after she and Durward had returned from attending a picture show at Bonner Springs. When the body was found, her father, Russell and Glenn were in bed.

The house is a farmhouse, on the south side of the Golden Belt highway, about three and a half miles west of Bonner Springs. Across the highway is the Elmer home. East of the Elftman farm is the Johnson farm. Across the road from the northeast corner of the Johnson farm is the Elmgrove school. Defendant purchased the farm of 160 acres, and moved into the house about December 12, 1919. Before that he and his family had lived in Bourbon county, and before that in Missouri, whither they had gone from Kansas.

The main room of the house, called the dining room, had a front door in the north and a window in the south. West of the dining room were two bedrooms. In the southwest bedroom were two beds, one used by defendant and the other by Durward and Russell. In this room were a clothes closet and a dresser. In the northwest room was a bed. On the west side of the dining room, between the doors entering the bedrooms, was a staircase leading to three rooms above. Mrs. Elftman, Ruth and Glenn slept in the southwest room upstairs. In the dining room were a heating stove, a table, which on the night of the tragedy was against the stairway casing, and a couch.

The kitchen was east of the dining room, and the outside kitchen door, on the east side of the room, turned toward the south when opened. On the south side of the room was a window, near which stood a woodbox. North of the door was a water table. In the room was a range with a water reservoir.

The stone steps at the kitchen door consisted first of a sandstone presenting a surface sixteen or eighteen inches square, ten inches below the doorsill. It rested on a stone two and one-half or three feet square, lying on the surface of the ground. Abutting the lower stone was a large flat stone embedded, or partially embedded, in the ground, from which a stone walk led away from the house. Stepped on in a certain way, the top stone would tilt a little. It was regarded by the family as stable, had never caused inconvenience and defendant repudiated the idea it was dangerous. Two or three persons who were not accustomed to it had been surprised by its tilting when they stepped on it.

When the body was discovered it was lying on its back, the head

on the south edge of the large flat stone and close to the steps, the feet straight toward the north, the right arm extended toward the east, and the left hand on the heart. Stockings were on the feet, but no shoes, and the skirts were rolled up so the lower part of the lower limbs was exposed.

On the day of the fatal occurrence defendant hauled two loads of coal from Bonner Springs to the schoolhouse, one in the forenoon and one in the afternoon. He was late to supper in the evening. Durward and Ruth, desiring to go to the picture show, had not waited for supper, and as they were on their way to catch an interurban car to Bonner Springs they met their father going home. Water for cooking and drinking purposes was obtained at Elmer's house. After eating supper with Mrs. Elftman, Russell and Glenn, defendant brought two buckets of water and filled the range reservoir. Returning for more water, he took with him some apples. The school board, composed of Elmer, Grimes and Clamm, were holding a meeting at Elmer's house. Defendant presented the apples, talked with the school board, received pay for hauling the coal, and returned home with two buckets of water, which he placed on the water table. Glenn had been put to bed, and Mrs. Elftman and Russell were reading by the lamp on the table in the dining room. Defendant read a paper for a little while, and, being tired, said good-night and went to bed. Soon afterward, and about nine o'clock, Russell went to bed.

When Durward and Ruth reached home, between 11 and 11:30 o'clock, they entered the house by the dining-room door. The lamp on the table was burning. Ruth passed on into the kitchen for a drink of water. She observed the kitchen door and screen door were both wide open. She closed them, and in doing so caught a glimpse of something on the steps, but gave it no attention. She returned to the dining room and passed into the southwest bedroom, where her clothes were kept, changed her dress, and came into the dining room, where Durward was sitting by the table, reading. She then went upstairs to go to bed. The lamp in her mother's room was burning. Glenn was asleep, but her mother was not there, and her side of the bed had not been disturbed. Ruth returned to the dining room and told Durward their mother was not upstairs. They looked for her, called for her, and Ruth went into the kitchen and opened the outside door. The object she had seen arrested her attention, and, lighting a match, she saw

what it was. She called to Durward, who went to the kitchen door
and saw his mother lying at the foot of the stone steps. Durward
and Ruth then went to the bedroom door, called Russell and their
father, and they all ran back to the kitchen door, Ruth carrying
the dining-room lamp. Durward and his father went outside, ex-
amined the body, and brought it inside. Russell was sent to call the
Elmers. The Elmers came within a few minutes, and Mrs. Elmer
telephoned for Doctor Beasley at Bonner Springs. He was delayed
by an accident to his car, and was brought to the house by Elmer,
arriving about one o'clock. Doctor Beasley examined the body
and pronounced the woman dead. He examined the kitchen steps,
and notified the undertaker at Bonner Springs, who removed the
body to his undertaking rooms before daybreak. The next morn-
ing Doctor Beasley and Doctor Candler held an autopsy at the
undertaking rooms. Later in the day a coroner's jury was im-
paneled, which examined the body and the Elftman house and
premises. In the afternoon defendant was arrested.

It was impossible that the wounds should have been self-inflicted,
and there were just two theories respecting cause of death—acci-
dent and felonious homicide. While the Golden Belt road is a
much-traveled thoroughfare westward from Kansas City, and two
men supposed to be tramps were seen that evening at the south
side of the farm a half mile from the house, there was no founda-
tion for rational belief that the killing was done by a stranger,
and the theories reduced to accident, or murder by defendant.

While living in Bourbon county Mrs. Elftman had pneumonia
following measles, and afterwards complained of pleurisy pains in
the region of her heart. Her heart was somewhat affected and she
was left in a weak and nervous condition. She was treated by
Doctor Sheeler, who referred to her as a frail and delicate woman.
He recommended use of a hot-water bottle to counter-irritate the
skin and so relieve pain. In troubles of that kind the heart is
fluttering and painful, the patient may seek outside air, and some-
times may be overcome and fall. The doctor said disease will
weaken the bones, and he expressed the opinion Mrs. Elftman's
skull had attained the fragility of a person in old age.

After removing to the Leavenworth county farm Mrs. Elftman
was treated by Doctor Beasley, on whom she called five or six
times between January and November, 1920. During that time
she had no organic heart trouble, but was a woman of ill health,

was physically below par, was nervous and excitable, and suffered from indigestion and gas in the stomach and bowels. At times she had nervous palpitation, and Doctor Beasley gave her nerve sedatives and remedies for digestive troubles. He said there was nothing about her sickness to make her bones brittle.

The children knew their mother, not as a confirmed invalid, but as a person who would not feel well for a few days and then would be all right again. Sometimes she would have a catch in her side. Once when she was digging potatoes she had a sudden severe pain about her heart, but she recovered in a few minutes. She never fainted, and defendant's testimony is barren of any reference to her ever fainting, or falling, or rushing to door or window for air. The boy Russell said she would sometimes go to a door or window for air, and that before he went to bed on the night of November 3, leaving his mother sitting by the table reading, she remarked that her side hurt her.

Defendant's own testimony was that he tried to be a model husband in all respects. He went to Missouri for his wife's health. He humored her by selling out and going to Bourbon county, and then by selling out and going to Leavenworth county. Sometimes they had such differences as husbands and wives will have, but he was kind to her, and tried not to provoke or irritate her, because he suspected some mental trouble. She reached menopause about a year before her death, and thereafter they slept apart. Defendant owned his farm, which was not heavily encumbered, his credit was good, and his wife's checks on his bank account were honored. He worked hard and took pride in improving his farm. He provided well for his family and was ambitious for the education of his children, who had been taught to be and were truthful. Neighbors and friends testified to his good character.

Defendant testified that on the fatal night he slept soundly. When he was awakened by the cries of his terrified children that their mother was dead, rushed out of the kitchen door, and by the light of the lamp saw his wife lying on the cruel stones, he said, "She has been sick and must have fallen there." With unerring instinct for the truth, his daughter said, "She did not fall without help." Defendant retorted, "Don't you dare say I killed her."

The Elmers had been excellent neighbors, helpful and kind in many ways. When they arrived they entered by the north door of the dining room. Defendant was in the kitchen, industriously

scrubbing bloodstains from the floor. He came to the dining-room door and said to Elmer, "My God! My God! What will I do?" The good neighbor, with unerring instinct for the truth, replied: "Elftman, what can you do? I think the best thing you can do is to let things alone until the coroner gets here; there is going to be something done here. You better leave things as they are." Defendant returned to his scrubbing and finished it to his satisfaction.

The fact is, defendant had not been sleeping soundly. When Ruth went into his room to change to her everyday dress he was not asleep. He raised up and looked at her and turned over and watched her. As soon as he was called he said, "My God, ain't it awful!"

After Durward and his father reached the body, Durward placed his hand over his mother's heart to see if it were beating. It was not, and the body heat had waned. His father returned to the kitchen and brought out a pan of water and a cloth to wash her face. Durward lifted up her head, found the whole back of the head crushed, and told his father it was no use, she was dead. Her hair was down and matted with blood, and her hair combs were found the next morning in the woodbox in the kitchen.

No one testified to seeing the hot-water bottle about the house that day, or even recently. About the time the defendant remarked that his wife had been sick and had fallen there he had the hot-water bottle in his hand. Where he got it nobody, except himself, knows. The only reference to the incident in defendant's entire testimony follows:

"Q. Did you find anything else around the body at any time prior to examining it on the couch? A. Yes, sir."

The next morning the undertaker found the hot-water bottle under Mrs. Elftman's clothing above the waist.

Immediately after Durward pronounced his mother dead, she was taken into the house, feet first, defendant carrying her feet and Durward her shoulders. Inside the kitchen defendant suggested laying her on the floor. Durward said put her on the bed. Defendant said, no, she would get the bed all bloody, and they should bring the couch from the dining room and put her on that. The body was placed on the floor, and before going for the couch defendant took a pail of water from the water table and dashed it on the stone steps. Then the couch was brought in and the body placed upon it.

A son, Sam, lived in Kansas City, and another son, Albert, lived in Nebraska. Durward suggested telephoning to his brothers, but defendant said wait until Elmer came. Defendant then began scrubbing the kitchen floor. Defendant testified he tried to telephone to a doctor, but was not able to get central. The children knew nothing of this effort; and when Elmer said call the doctor, Mrs. Elmer had no difficulty in getting central. Later, and before the doctor arrived, Durward telephoned to his brother in Kansas City. Defendant testified he had hoped that his wife was alive until the doctor came; but when Durward was about to telephone to his brother, defendant said, "Just tell him she is dead."

The wounds had bled copiously and there was much blood in the vicinity of the place where the head lay. Durward, however, handled his mother's head and was outside the kitchen all the time his father was there. Defendant testified he was barefooted when he went outside. Durward thought his father had on shoes, which were not laced, but was not positive. Defendant testified, with naïve brutality, that his wife's blood was between his toes, and he was obliged to wash his feet before Elmer came, to keep from tracking up the house. The children knew nothing about the feet-washing. Mrs. Johnson came after the doctor went away. Mrs. Shaw came the next morning, and the premises were carefully examined for blood stains the next day. So far as the evidence discloses, there were no bloody footprints leading from the place where the body was first deposited in the kitchen to the place where the couch stood in the dining room. The jury may have believed that defendant stepped in his wife's blood with his bare feet and afterward washed his feet. If so, they doubtless believed that he washed his feet not merely before the Elmers came, but before the children arrived from Bonner Springs.

When Mrs. Elftman's body was found she was without shoes. Sometimes she left her shoes on the north side of the dining-room stove when about to go upstairs for the night. The morning after her death Ruth found her shoes by the wall and took them into the southwest bedroom. There was some dirt on the back of the heel and on the instep. Her father asked her what she was doing with the shoes and she replied that she was putting them away. He asked to see them; she handed them to him and left the room. A little later she observed them, and they had been washed, and were still wet.

Early the next morning the defendant took a basin of water and a towel into his room and took a bath, which was something unusual. He explained that he had coal dust on him. Later he burned some letters he had abstracted from his wife's locked trunk. Two keys to the trunk had previously disappeared, and Durward had made a third one for his mother.

The morning after the body was discovered blood was found behind the kitchen door and near the woodbox. Behind the woodbox was a hammer, which the evening before was in a bucket of walnuts in another part of the room. On the outside of the door were bloody finger prints, clearly not made when the body was carried into the house, because defendant used both hands to carry the feet and Durward used both hands to carry the head and shoulders. There was blood on one of the steps, bits of something which may have been hair, and a bit of something which may have been skin. The course of blood running from the head was traced.

A reading of the record leads to the conclusion that Elmer must have been a convincing witness. Carefulness, candor, impartiality and fearlessness in speaking the truth are manifest in all he said. On examination by the court, he told of a pool of blood which could not have been made by a stream flowing from where the head lay when it was discovered, and the body had been moved three or four feet, from one position on the ground to another. The necessary inference was that the body had been posed to present the appearance which it bore at the place where it was found.

The school-board meeting at Elmer's house adjourned at ten o'clock or a little later. Grimes' wife was with him. When they were leaving for home the engine of his car stopped before the car was put in motion. He got out to crank the engine a second time, and heard a scream, which seemed to proceed from defendant's house. Hearing nothing further, he cranked the car and went on home. Counsel for defendant pressed the witness to know if the sound were such as a person might make if he were to fall and strike something hard. The state objected and the following occurred:

"The witness: You want me to tell just how that came to me?

"The court: Yes. A. It came to me a scream, just like somebody in distress."

Although the witness said nothing at the time to his wife about what he had heard, he told of it the next day when he learned of Mrs. Elftman's death.

The theory of a fall involved distinct and unrelated elements.

The testimony was, when Mrs. Elftman used the hot-water bottle, she would lie down. If she suffered an attack which impelled her to seek air while she was lying on the couch in the dining room, the north door afforded near relief. If she were seized while in the kitchen she reached the air of the cool November night when she opened the door, without taking the trouble to push it wide open and then to push the screen door wide open. If when at the door she fainted or collapsed and fell, the tipping stone had nothing to do with her injuries. If, with the hot-water bottle in her hand, she opened both doors and consciously started down the steps in her stocking feet, and the step tipped so that she fell backward and struck her head, fainting or falling from collapse was redundant. Defendant placed most stress on a fall caused by stepping on the top stone in such a way that it threw her backward. She was not as tall as Ruth, weighed but 115 or 120 pounds, and the evidence was overwhelming that no fall from anywhere upon or about the steps could produce the wounds she received.

The wounds on the side of the head were transverse, were an inch long, opened the scalp to the skull, were three-quarters of an inch apart, and nearly parallel. The back part of the skull at its thickest place suffered a compound comminuted fracture. Comminuted means reduced to fragments. In the center was a hole, two and a half inches transversely and one and a half or two inches vertically from the hair line, where the skull had been crushed in. One fragment of skull an inch and a half long and an inch wide was completely severed, and rested in the tissues beneath the skull. The soft tissues over the place had been lacerated so that the index finger could be passed directly through to the inside of the skull. Cracks in the skull extended from the opening to the mastoid processes on each side—approximately from ear to ear. The tissues about the hole in the skull and on the upper part of the neck were beaten to pulp. The two doctors who conducted the autopsy concurred in the opinion that nothing but repeated blows with a blunt instrument could reduce the head to the condition in which it was found, and there was no evidence to the contrary. Defendant's attorney refrained from taking the opinion of Doctor Sheeler on the subject. He merely propounded two hypothetical questions patently improper because they omitted most of the material facts, and suffered objection to them to be sustained.

The children, except of course little Glenn, all testified that their father had committed battery upon their mother in Missouri and in Bourbon county. In July, 1918, Mrs. Elftman consulted an attorney in Fort Scott in reference to a divorce. In April, 1920, a divorce action was commenced in Leavenworth county, based on a battery which occurred in Bourbon county on November 9, 1919. The action was subsequently dismissed. While it is true that defendant and his wife were occupying separate beds, it was not through his forbearance. When the family first moved to the house where the killing occurred, Mrs. Elftman, Ruth and Glenn slept in one bed in the southwest room where defendant slept. One night defendant wanted his wife to sleep with him. She would not, and he took her by force to his own bed, and then beat her with his fists. Doctor Beasley testified as follows:

"I was called out there one Sunday morning. I think it was the 28th of March, 1920. Some one called me over the phone—I was at breakfast—and asked me to come out, and when I went out I found the family in the dining room, sitting around the stove. I saw they were all there, and I asked who the patient was. I think it was Mr. Elftman pointed over to Mrs. Elftman, and Mrs. Elftman said, 'You have to leave me alone.' Mr. Elftman said, 'I have not done anything.' She said, 'You have not done anything? You have to leave me alone.' So I said, 'You people have here a family trouble that is a matter for you to settle yourselves'; that I did not have anything to do with that kind of business. So I left them there, and went home."

Ruth testified as follows:

"One night, I think, I believe it was about June, in June some time, the boys were going to Bonner Springs to a show, and just my mother and Glenn and my father were left at home, and I went upstairs and went to bed. I left my mother in the dining room, and Glenn and I went to bed. And shortly before the boys came home she came upstairs and woke me up and told me he had beat her.

"Q. Was your father present at that time? A. Yes.

"Q. How did he happen to be present there? A. He followed my mother upstairs.

"Q. Go ahead. A. When she told me he had been beating her she was crying and breathing so hard. He had almost knocked the breath out of her, and she said she would not stay in the house alone with him again."

After the divorce proceeding in Leavenworth county was dismissed defendant told his wife if she ever started another divorce case he would make it so she would never trouble anybody again. Some time before the killing Mrs. Elftman was contemplating bringing another action for divorce. Durward testified as follows:

"Russell had gone home, and me and my father were coming home with the team. And we stopped to water them at the creek, a little branch there, and he said that he—he said he was sorry the old woman had started another divorce case; he did not see why in hell she could not have said something about it, so we would not have to be sowing all of that wheat."

On the Friday before November 3, Mrs. Elftman told her husband she had been to Leavenworth and intended to commence another divorce case. Russell testified to the following occurrence on the same Friday night:

"I heard my father tell Mr. Elmer that the old woman and the kids were going to leave home, and Mrs. Elmer told him that she was sorry that there was any trouble like that."

The killing occurred on Wednesday night. That day Mrs. Elftman was packing her trunk, expecting to leave the next Monday.

The facts and inferences of fact contained in the foregoing are derived from an abstract of approximately 500 printed pages. Such details as seemed most important have been stated, because the case is one of murder, the conviction rests on circumstantial evidence, and more than eighty pages of defendant's brief are devoted to a contention that he should have been discharged for lack of proof of guilt. It seems necessary to remind counsel in every important case that this court cannot and does not determine credibility of testimony or weigh conflicting testimony. In disposing of defendant's contention, nothing need be added to the following paragraph of the opinion in the case of *The State v. Stout,* 114 Kan. 585, 220 Pac. 180, a case in which the defendant was convicted of murder in the first degree on circumstantial evidence:

"The rule that, to warrant conviction, circumstantial evidence must be inconsistent with any reasonable hypothesis except guilt of the accused, is a rule of trial procedure and not a rule of appellate procedure. The jury decides between hypotheses, and the function of this court is limited to ascertaining if there was evidence to support the hypothesis adopted. In this instance there was evidence from which the jury might reasonably infer defendant was guilty as charged." (p. 593.)

The information charged the crime was committed by means of a blunt instrument, a more definite description of which the informant was unable to give. The information was sufficient in every respect, unless it were indispensable that the blunt instrument be more fully described. Defendant's motion to quash the information for failure to give such description was denied.

Prosecution for murder is not blocked at inception because the

15—116 KAN.

grand jury or the county attorney is unable to say whether the instrument used was a cudgel or a piece of gas pipe. If it be known which was used, the means whereby the fatal wounds were inflicted should be stated for purpose of certainty, but not as an essential element of murder. If not known, the constitutional requirement that defendant be informed of the nature and cause of the accusation (Bill of Rights, § 10), and the statutory requirement of certainty regarding the offense charged (R. S. 62-1005), are satisfied by charging murder with a blunt instrument. The law on the subject is summarized in 30 C. J. 101 and 102, and was applied in the case of *The State v. Buck,* 88 Kan. 114, at page 124, 127 Pac. 631. In this instance the state was not able to identify any particular instrument as the one with which the side of Mrs. Elftman's head was struck and the back of her head was crushed. The state was able to prove that the wounds were inflicted by a blunt instrument, and the charge was sufficient both on the face of the information and under the evidence.

Defendant moved for a change of venue on account of prejudice of the district judge. The motion was properly denied, on the authority of the following cases: *City of Emporia v. Volmer,* 12 Kan. 622; *The State v. Bohan,* 19 Kan. 28; *The State v. Parmenter,* 70 Kan. 513, 79 Pac. 123; *The State v. Tawney,* 81 Kan. 162, 105 Pac. 218; *The State v. Tawney,* 83 Kan. 603, 112 Pac. 161; *The State v. Sexton,* 91 Kan. 171, 136 Pac. 901.

Three jurors were challenged because on *voir dire* they indicated they had formed and expressed opinions respecting material issues. On full examination the court determined they were qualified, and the challenges were properly overruled on the authority of the following murder cases: *The State v. Stewart,* 85 Kan. 404, 116 Pac. 489; *The State v. Mullins,* 95 Kan. 280, 147 Pac. 828; *The State v. Smith,* 103 Kan. 148, 174 Pac. 551; *The State v. Henson,* 105 Kan. 581, 185 Pac. 1059.

Complaint is made because the court permitted Doctor Beasley and Doctor Candler to give opinions covering the subject of how the deceased received her injuries. The ground of the complaint is that the subject was not one for expert opinion. Altogether twelve questions were asked calling for opinions of the doctors. Two were answered without objection. The objection now urged was made to just one, the fourth propounded to Doctor Beasley. That question was withdrawn. The result is, it was not doubted at the trial that opinion evidence was admissible.

The State v. Elftman.

The state could produce no witness who saw how Mrs. Elftman met death; defendant claimed he was not present, and the jury was obliged to determine the manner in which and the means by which mortal wounds were inflicted on a human body, by inference. The contention of both the state and the defendant was that the wounds were caused by application of force to the structural substances. The state claimed the force was applied by repeated wielding of a blunt instrument, the deceased's head being passively resistant. Defendant claimed the force was applied by the falling body of the deceased, the stone steps being passively resistant. The data for the jury's inference lay in a field of knowledge scientific in character, most thoroughly apprehended by specialists. The trained professional mind has peculiar qualifications for observation and interpretation of such data. It was not possible to make experts of the jurors in the course of the ten-day trial, and the only effective method of giving them the benefit of professional knowledge, training and skill was to bring to their consideration conclusions in the form of opinions of those who were competent to express them. The true criterion for determining whether or not opinion evidence is admissible is correctly stated by Dean Wigmore to be: "On *this subject* can a jury from *this person* receive appreciable help?" (4 Wigmore on Evidence, 2d ed., § 1923.) Better authority for admission of doctors' opinion in this instance could scarcely be found than the case cited in defendant's brief:

"One of the questions which became the subject of exception here insisted upon was, I think, clearly competent in that view, viz., as to the amount of force requisite to break the skull. He had not only the skill and knowledge resulting from his professional familiarity with anatomy, and the structure, thickness and strength of the human skull generally, but he had the particular knowledge acquired by the examination of the skull of the deceased. That he was competent to speak as an expert, of the power of resistance of the skull, and so of the force requisite to break it, as it was in this case broken, seems to me quite clear. But here, I think, was an end of the inquiries permissible to draw from his mere opinions. Having stated all this, he was no more competent to give an opinion as to the position of the body, when struck, than any other person." (*Kennedy v. The People,* 39 N. Y. 245, 256.)

In the case of *Clemons v. State,* 48 Fla. 9, the question was whether the fatal blow was struck with metallic knucks or some similar weapon, or with the naked fist. The court said:

"The physician had testified that there was a comminuted fracture of the left cheek bone of the deceased Smith, or, in plain English, that the bone was broken to pieces, and that the flesh of the cheek was very much bruised.

There were also a number of wounds and fractures of the inner table of the skull described by the physician. . . . We are of opinion that a physician, who is by virtue of his profession better acquainted with the human anatomy and with the resisting power of the bones and tissues, should be allowed, under the circumstances of this case, to answer the question whether in his opinion the wound or wounds described by him involving comminuted fractures of the cheek bone and of the inner table of the skull could have been produced by a man's naked fist." (p. 16.)

In the case of *Davis v. State,* 38 Md. 15, the question was whether fatal wounds were received by falling into a bin of a mill or were inflicted by blows of a blunt instrument. The court said:

"Here the body of the deceased was found in the sink or bin of his mill, with six wounds on the head, one of which involved a fracture of the skull, and in the absence of direct proof, the question as to how and by what means they were inflicted depended to some extent at least upon the character and appearance of the wounds themselves. The inquiry then involved not only the general appearance of the wounds and the extent of the injury, whether they were inflicted by a sharp or by a dull instrument, or by accidentally falling into the sink, but also some knowledge at least of the anatomy of the skull—the relative strength and weakness of the several parts thereof—questions which could only be satisfactorily determined by the skill and experience of persons accustomed to and familiar with the examination of wounds." (p. 38.)

These cases sufficiently illustrate the principle involved, and it is not necessary to multiply citations applying the principle.

When Durward and Ruth went to the picture show, Russell was left at home. Ruth was asked why Russell did not go. Over objection, she said: "He did not go because we never left mother alone with father after the proceedings in June."

While the form of the question and the form of the answer were technically objectionable, the substantive matter of the answer was not a conclusion, but a fact: "We never left mother alone with father after the proceedings in June." It will be recalled that in June, after an attack upon her, Mrs. Elftman said she would not stay alone with her husband, and on another occasion defendant told her if she commenced another divorce proceeding he would make it so she would never trouble anyone again. The relations between defendant and his wife were very material, and the circumstance developed by the testimony threw light on those relations.

Complaint is made that the testimony that defendant took a bath expressed a mere conclusion of the witness. Defendant admitted he took a bath, and merely shifted the time of taking it several hours.

Passewark, the deputy sheriff who arrested defendant, catechized him concerning death of his wife. Passewark testified as follows:

"Q. Did he give you any idea at all as to how he thought she came to her death, other than what he said about her, 'She must have fallen there'? A. He never did.

"Q. Did he ever tell you about anybody else he suspected? A. He did not.

"Q. Or tell you to look for anybody? A. He did not.

"Q. Did he ever tell you to make any effort to look into the matter? A. No."

Complaint is made because defendant's motion to strike out the last three answers was denied. The fact that the Elftman house stood at the side of the Golden Belt highway, and the fact that tramps were actually seen at nightfall in the vicinity, were given emphasis by defendant in the course of the trial, as furnishing a possible explanation of the homicide. The fact that defendant himself did not do the things which he would naturally do if he considered the explanation plausible tended to refute the explanation, and did not involve implied confession of guilt, because he said "she fell."

Defendant brought the stone steps to the courthouse and desired to introduce them in evidence. Permission to do so was refused. Throughout the trial photographs of the steps in their natural state, taken from different camera positions, were freely used. In an affidavit read at the hearing on the motion for new trial the attorney who represented defendant in the district court stated the photographs did not fairly represent the appearance of the steps. A number of witnesses who had seen the steps, and who testified from the photographs, stated the photographs did fairly represent the appearance of the steps and their surroundings. The affidavit further stated that defendant could have shown at the trial that the steps were in "practically" the same condition as at the time of Mrs. Elftman's death. The showing should have been made in support of the motion for new trial. If, however, the proposed showing had been made it would not have been sufficient. In no event were the stones admissible in evidence unless it was clearly proved they had suffered no change in appearance. When defendant's attorney was cross-examining Doctor Beasley in reference to the setting and appearance of the stones, the following occurred:

"Q. You saw it afterwards, with myself, did you not? A. Yes.

"Q. About a month afterward or something of that kind? A. Yes.

. . . . . . . . . . . .

"Q. Was there any indication of any fresh change made when you and I went out there, anything of that kind? A. Well, the corner of the stone had been knocked off.

"Q. Yes, somebody had knocked off the corner of the stone? A. Yes."

Under these circumstances the court properly refused to permit the stones to be exhibited to the jury.

Defendant offered what is called character evidence, consisting of testimony of witnesses that his general reputation as a quiet, peaceable, law-abiding citizen was good. The court advised defendant's attorney in advance that the number of such witnesses would be limited to ten. Having used that number, defendant desired to read depositions of fifteen others and was not permitted to do so. Authority of the court to limit the number of witnesses upon a single issue is undoubted. (4 Wigmore on Evidence, 2d ed., § 1908; Note, 21 A. L. R. 335.) While good general reputation of defendant was not expressly admitted by the state; the issue was not contested. The notification gave defendant opportunity to marshal his evidence to best advantage; more would have been merely cumulative, and this court has nothing on which to base a declaration that the district court abused its discretion.

Defendant requested the court to instruct the jury that if they concluded defendant had borne a good reputation it would require a greater degree of certainty of proof in order to convict than would otherwise be necessary. The request was properly denied. While evidence of good character may in some instances create a reasonable doubt of guilt, such evidence merely takes its place as a part of the whole case made by the evidence, and whether defendant's reputation had been good or bad, one standard of certainty was required in order to convict—certainty of guilt beyond a reasonable doubt.

The instruction given upon the subject of character evidence was correct and adequate; and in view of that fact, a criticism of use of the introductory words "some evidence" is captious.

There is nothing else in the case deserving special discussion, and the judgment of the district court is affirmed.