State v. Lawellin.

No. 28,128.

The State of Kansas, *Appellee*, v. Ernest Lawellin, *Appellant.*

(264 Pac. 1035.)

SYLLABUS BY THE COURT.

Larceny—*Theft of Chickens—Evidence.* In a prosecution for grand larceny for the theft of chickens, the evidence examined and held sufficient to require the submission of the cause to the jury; and no error in the verdict of guilty on two counts nor in the judgment and consecutive sentences imposed pursuant thereto is disclosed by the record.

Appeal from Labette district court; William D. Atkinson, judge. Opinion filed March 10, 1928. Affirmed.

*A. D. Neale,* of Chetopa, for the appellant.

*William A. Smith,* attorney-general, *Charles H. Cory,* county attorney, and *J. M. Hewitt,* assistant county attorney, for the appellee.

The opinion of the court was delivered by

Burch, J.: The defendant was convicted on two counts for the felonious theft of poultry. He appeals, contending that the evidence was insufficient to sustain the judgment, and that a verdict of not guilty should have been directed.

The prosecution was in four counts for the theft of poultry from four separate farms, that of Ramsey, Wheeler, Redman and Morris respectively. The jury acquitted the defendant on the counts for the thefts of the Ramsey and Morris chickens.

The evidence supporting the charge involved in the theft of the Wheeler poultry was to this effect:

Wheeler and wife resided on a farm a few miles south of Parsons. They owned a flock of seventy-three certified Buff Orpington chickens. About 1:30 o'clock p. m. on February 12, 1927, Wheeler and wife went to town, leaving no one at home and returning about 5 p. m. Two witnesses, Harry Hearson and his sister Velma Hearson, who were walking on the public road that afternoon saw defendant at the Wheeler home between the house and the barn. His automobile, a Ford coupé, was standing in the driveway headed outward. The witness, Harry Hearson, knew defendant. The latter asked him, "Harry, who lives here?" Hearson answered, "Wheeler lives here." Defendant then said, "I sure would like to

Larceny, 36 C. J. p. 921 n. 64.

see him." While defendant and Hearson were talking, Velma Hearson was standing near defendant's automobile. She testified that she "heard a noise like chickens flopping or stepping around," and that the noise was "in the back end of the car." As defendant drove away Harry Hearson asked him, "Are you going to Parsons, Ernest?" Defendant answered, "No." Shortly afterward on the same afternoon Hearson and his sister caught a ride to Parsons and saw defendant there. Parsons was a market place for poultry, and a poultry dealer testified that a young man about the age of defendant sold him poultry on February 5, and delivered them in a Ford coupé and that the hens were loose in the back of the coupé; but this witness did not identify defendant, saying only that his face was familiar. When Wheeler and wife returned from town they discovered that a number of their chickens were missing. Wheeler testified that defendant was unacquainted with him, and had no business with him, and that notwithstanding the desire defendant expressed to Harry Hearson at the Wheeler farm that he "sure" would like to meet Wheeler, "defendant had never looked him up about any matter at all." While the evidence pertaining to the sale of chickens to the dealer on February 5 had no direct bearing on the theft of the Wheeler chickens on February 12, yet the fact that there is a practical method of transporting chickens to market loose in the rear compartment or "turtle-deck" of a Ford coupé was of some minor evidential significance. Counsel for defendant would belittle the testimony of Velma Hearson who heard chickens flopping about in the rear of defendant's coupé. That evidence, if true and if believed, was certainly highly probative. Moreover, the presence of defendant at the Wheeler place on the afternoon the chickens were stolen was of some evidential value, especially when not explained in some honorable way, and not readily explainable except on the theory that he was there for some improper purpose which the theft of the chickens later convincingly revealed. What other motive would take him there when he did not know who lived there? And on being told by Hearson that it was Wheeler's place, he said, "I sure would like to see him." Manifestly that was to give some sort of excuse for his presence there—at least the jury might so infer. And when asked by Hearson if he was going to Parsons he replied in the negative, but shortly afterwards was seen in that city. The manifest purpose of that prevarication was to avoid the em-

barrassing situation of having to decline to give Hearson and his sister a ride to town, when if he did give them a ride, they were bound to discover the "flopping" cargo he had in the rear of his coupé—at least the jury might so infer. It seems also to be a custom among certified poultry raisers not to let their valuable chickens run loose out of doors in the winter time, so it would have been an easy matter for a thief to catch and be off with them in short order.

The evidence of defendant's guilt on this count was sufficient to take the case to the jury under the system for bringing criminals to justice which prevails in this commonwealth. (*State v. Lister*, 121 Kan. 524, 247 Pac. 846; *State v. Hards*, 125 Kan. 364, 263 Pac. 1055.)

Touching the charge involved in the theft of the Redman poultry, the evidence tended to show that Redman lived on a farm three miles northwest of Oswego; that he had a large flock of chickens; that on August 20, 1927, he and his wife left their farm about 7:30 o'clock p. m. and went to Oswego and remained there until midnight. On their return, Redman lit a lantern and looked into his chicken house and found a number (about forty) of his chickens missing. He discovered some automobile tracks in his barnyard and covered them with boards. Later it was shown that the automobile tracks were made by Fisk tires, and that shortly before the theft defendant had purchased a new Star coupé with Fisk tires. The evening the chickens were stolen two neighbors heard the quiet hum of a new car going by, and one of them testified that it turned into Redman's driveway, and shortly afterwards he heard chickens "squalling," and that he walked to the north end of his porch and ascertained that the "squalling" of the chickens was at Redman's. About two weeks after this theft, defendant and his father called at the Redman residence where a conversation was had as follows:

Defendant: "Mr. Redman, they have got a warrant for me up there."
Redman: "Have they?"
Defendant: "They sure have."
Redman: "Well."
Defendant: "Did you have some chickens stolen?"
Redman: "Yes. . . ."
Defendant: "If there is an old hen dies around here anywhere it is laid onto me. . . . They even laid the stealing of Rowe's harness off on to me."

Redman: "I don't know anything about that, but I can tell you about everybody I have talked to insinuates that way too."

Defendant (addressing his father): "Let's go."

Defendant's father then took up the conversation with Redman, (defendant being about six feet away): "There has been so much laid onto this boy, if I knew how much it was we might settle for these chickens. . . . If he is guilty I want him to go."

An incident of some significance occurred while defendant and his father were at Redman's. Defendant drove his car into the yard and backed it around in the same manner as the car used in carrying off the chickens had been backed two weeks before. Not only were the tread marks similar, but the tracks made in driving and backing were so much alike that an inference could be drawn that the driver and car in both instances were the same. The similarity of tire treads is judicially recognized as probative and helpful in identifying thieves. (*State v. Frey,* 111 Kan. 798, 208 Pac. 574.) The conversation of defendant with Redman, and defendant's silence following the remarks of his father in his presence, were indicative of a consciousness of guilt. (*State v. Cruse,* 112 Kan. 486, 212 Pac. 81.) Altogether the evidence on this count, although not strong, made a *prima facie* case for the consideration of the jury. (*State v. Stout,* 114 Kan. 585, 220 Pac. 180; *State v. Brizendine,* 114 Kan. 699, 220 Pac. 174; *State v. Kennedy,* 124 Kan. 119, 257 Pac. 726; *State v. Buseman,* 124 Kan. 496, 260 Pac. 641.)

Considerable space is occupied in defendant's brief inveighing against the discourtesy of the county attorney, who declined to permit defendant's counsel, employed just before the trial, to read a transcript of the testimony taken at the preliminary examination. But the mere matter of civilities between counsel is not within the jurisdiction of courts to control. (*State v. Laird,* 79 Kan. 681, 100 Pac. 637.)

The record contains no error and the judgment is affirmed.

HARVEY, J., dissenting.