THE STATE OF KANSAS, *Appellee,* v. G. H. BUCK,
*Appellant.*

No. 17,884.

SYLLABUS BY THE COURT.

1. MURDER BY POISON—*Sufficiency of Information.* An allegation in an information for murder by poisoning is sufficiently certain which charges that the defendant administered to a person named "certain deadly drugs and poisons, to wit, cyanide of potassium and hydrocyanic acid, and also other drugs and poisonous substances to this county attorney unknown," although such other .drugs and poisonous substances are not otherwise designated or described. ˙

2. EVIDENCE—*Death by Poison—Exclamations of Deceased.* An exclamation of a person made when taking a dose of supposed medicine that it burns her stomach, accompanied by a wry face, sudden sickness and vomiting, is admissible in evidence on the trial of a charge of poisoning such person.

3. ——— *Administering Drugs to Deceased.* Evidence tending to show that one accused of murder by means of poison administered a preparation of ergot, cotton root and dilute sulphuric acid to his alleged victim several times in the two days preceding her death is admissible under the charge stated in the first above paragraph, although he administered a different treatment immediately before her death, the various treatments appearing to be parts of a connected transaction.

4. ——— *Druggist—Prescriptions—Request of Defendant.* The testimony of a druggist that the appellant had requested that a prescription for ergot and other drugs presented by and filled for him should be kept from the prescription files kept in the drug store was admissible with the prescription in connection with the evidence referred to in the last above and next succeeding paragraph.

5. ——— *Identification of Medicines Administered.* To identify a substance administered as a medicine, persons who were present when it was given and who described it as having a strong, disagreeable odor may be allowed to compare the odor of the liquid so given with the contents of a bottle produced on the trial, and testify whether the smell is the same.

6. ——— *Hypothetical Questions—Opinions of Experts.* A distinction between a hypothetical question to an expert witness

The State v. Buck.

calling for an opinion as to what might or could have caused death, and one asking for an opinion as to what did cause it, is considered and the latter form is approved. A question asking for an opinion of the cause of death, based upon a given hypothesis, or upon personal knowledge of the conditions, or both, is one that a properly qualified witness may be allowed to answer.

7. ——— *Cross-examination of Expert Witnesses.* On cross-examination a hypothetical question omitting material facts which the evidence tended to prove, and which were included in a question asked upon direct examination, is permissible within reasonable limits, to test the intelligence, capacity, discernment and candor of the witness; but where the cross-examination proceeded at great length and the witness testified upon the matters embraced in the question in detail and admitted that he did not know positively whether the death might have occurred from poison without the symptoms stated, the ruling excluding the question did not affect the substantial rights of the appellant.

8. VERDICT—*Murder by Poison.* Upon a charge of murder by poison it is not necessary that the verdict should state the kind of poison used.

Appeal from Kiowa district court. Opinion filed November 9, 1912. Affirmed.

*George A. Neeley,* of Hutchinson, and *L. M. Day,* of Greensburg, for the appellant.

*John S. Dawson,* attorney-general, and *C. H. Bissitt,* county attorney, for the appellee; *J. D. Beck,* and *J. W. Davis,* both of Greensburg, of counsel.

### STATEMENT.

The appellant was convicted of the murder of his wife by means of poison. Errors are assigned upon orders overruling motions to quash the information, for a new trial and in arrest of judgment. Also upon various rulings relating to the evidence and instructions.

The appellant is a physician and has practiced his profession at Greensburg since October, 1908. He was

married in December, 1909. His wife died ·at her home on October 17, 1910. She was 23 years of age and had possessed excellent health until near the time of her death. Her younger sister was a member of the household. Her brother was at her home for a few days before her death. Her father came on Saturday, and her mother came on Sunday and was with her when she died on the following Monday. The body was not embalmed and was buried on Tuesday. Two weeks afterwards it was exhumed and an autopsy held. Parts of the viscera were delivered to a professor of organic chemistry of the state university who made an analysis for the purpose of ascertaining the presence of poison.

Evidence was given ·tending to prove the following facts, among which brief quotations from the testimony are given for greater clearness: On August 23, 1910, Dr. Buck made and presented to a druggist at Greensburg, who ·is his brother-in-law, a prescription for two ·ounces of fluid extract of ergot, fluid extract of cotton root, and dilute sulphuric acid, which was filled. Two ·weeks later he had the same prescription filled, only the ·quantity was doubled, and the compound was taken ·away in a bottle. At the doctor's request the prescription was not filed with other prescriptions as the ··custom of the druggist was, but it was found and produced at the trial. About October 1, 1910, the same druggist sold and delivered to Dr. Buck two ounces of ¨hydrocyanic acid in a bottle, which he requested should ·not be labeled, saying that he would use it himself. 'This druggist had previously ·given prescriptions for ·the same article. The doctor's office was near the drug ;store, with which he was familiar. At times he had ·put up prescriptions. The druggist kept in his stock potassium cyanide as well as hydrocyanic acid. The doctor knew where these articles were kept in the store. On Saturday preceding Mrs. Buck's death, Dr. Buck

The State v. Buck.

gave her a dose with a teaspoon out of a four-ounce bottle of some dark thick fluid having a greenish hue and a strong disagreeable odor. She complained that it burned her stomach, and she vomited in a few minutes and was very pale and sick for twenty or thirty minutes, when she regained her usual feelings. Dr. Buck left for the country immediately after giving the dose, telling her brother that she had inflammation of the stomach and bowels. On Sunday morning he gave her a like dose of the same liquid. In two or three minutes she lay down and soon vomited. In the evening he gave her another dose of the same kind, followed immediately by sickness and vomiting as before, after which she appeared to be well, and ate supper of toast and milk, and apparently rested well that night and appeared to feel well the next morning. Her mother attended to the household duties, and Mrs. Buck did not leave her bed until about 9:30 A. M., when she arose to answer a telephone call and held a lengthy conversation with a sister over the telephone. She partook of a dinner of bread and milk with her sister. Dr. Buck left after breakfast and returned between 11 and 12 o'clock and gave her another dose in a teaspoon, which she vomited up. When taking these doses Mrs. Buck made a wry face and complained of a burning sensation, and pallor and vomiting followed. On Saturday and Sunday, after the vomiting referred to, her complexion was clear and she appeared cheerful and bright. Between 1 and 2 o'clock on Monday Dr. Buck called two physicians of Greensburg to see his wife and told them that she "had been ailing for a week or ten days, that she had been nauseated, that was the chief symptom of which she complained, that she had some pain in the abdominal region, and he further stated that she—her stomach was very irritable, that she could not retain anything on it unless it was excessively cold and after a short time that came up

. . . that she had alternating constipation and diarrhœa; and he mentioned that he had been on the verge of diagnosing it appendicitis; that an hour or so before we came her bowels had moved . . . that the first action seemed to contain blood." He said that he had used cocaine, nux vomica, and bismuth to control the nausea. These doctors made an examination. Her temperature was 98⅘, pulse 90. They quickly eliminated appendicitis and found apparently normal conditions except a slight tenderness in the lower abdomen upon pressure. Her general appearance was good, skin clear, eyes bright, and tongue clear. The visiting doctors asked her husband to make a vaginal examination, which he did while they were out of the room, and reported to them that he found conditions normal, and said that she had menstruated normally ten days before. They concluded that she was not very sick but came to no satisfactory conclusion about the vomiting, and recommended that the stomach should have absolute rest for twenty-four hours, to which the patient said: "I think that would be a good idea." They recommended that nothing be given to her except calolactose tablets, and a saline injection if thirsty. At 3 o'clock Dr. Buck gave his wife a dose which he said was water and a little carbolic acid, and also gave her an injection, and then left the house. She made no complaints during the afternoon, but called for a magazine, talked with her mother and sister about dressmaking, and laughed and joked with a neighbor who called. She slept a little after four o'clock. At 5 o'clock Dr. Buck returned, sat in the room a while, and then said: "I must go and make a fire and get to work," and went to the kitchen. He came back carrying a teaspoon carefully, and told her it was a drop of carbolic acid and water. She said it would make her stomach burn. He said "Take it, it won't hurt you," and poured the contents of the spoon into her mouth.

She became nauseated and sick. He hurried to the kitchen and returned with a hot water bottle already filled and commenced giving an injection. Her mother who was present describes what followed:

"I seen her eyes did n't look right, and her face, and I told him to stop and take that out, and he did not do it, and I told him the second time, and he stood still, stood there, and I grabbed a handkerchief and run to her to see if I could help her, I was afraid to speak, I was scared she looked so wild and scared in a way, and I went to her, and I told him to call Mathis or somebody, and then he went and called them and called Dr. Carter and Dr. Willey and told them to come right away, I reckon they done the—I don't know what he said in regard to them coming, but he came back then and grabbed her face and told her to wake up. The froth was working out of her mouth, and her hands were drawn down, and her head was all drawn back . . . and he did not do a turn to do anything for her, I went to her but he did not do anything, I thought he would do something for her but he did not, and just— . . . her eyes looked wild like and the sights were spread open, and she was just commencing to draw her head back that way, and her little hands were drawed down and cramped."

She described her eyes as "glassy" and "spread out" and said she appeared to be unconscious and reaching for breath. The doctors who had made the previous examination came immediately. One of them describes her condition:

"I found her lying on her back in bed, the same bed she had been in, in the afternoon; she was lying close to the edge of the bed with her head over the edge of the pillow, the head was drawn back, that is, it was in about that position (witness indicating), the eyes were rolled slightly upward, open, and fixed, of a glassy appearance, pupils dilated, the face was what we term cyanotic or bluish, the mouth was—the face was sort of drawn, and the mouth formed a sort of a circle or more of an oval, the teeth were open and the lips were open and the teeth were open, when I first observed her, the tongue was protruding slightly

between the teeth but later it dropped back so it was still visible between the teeth. She was motionless and completely unconscious. The most pronounced thing was the condition of her breathing; she was breathing intensely labored, forced breathing; the inspirations, the drawing in of the breath, was sort of an effort, gasping, then there was an interval, and then a rather forceful expiration, then a gasping inspiration again; these gradually became further and further apart, until they ceased entirely, in I judge twenty or twenty-five minutes; the pulse I did not count it, but I took hold of it when I first got in, and it was regular, a fairly regular even pulse, enfeebled somewhat and rapidly growing weaker as the respiration seemingly failed, as the respiration became more depressed the pulse gradually grew weaker, indicating to us that the heart did not fail until after the respiration did. I stated, I guess, the pulse was even but enfeebled and gradually growing weaker. Her temperature was not taken. She was in a slight state of rigidity, that is, she was tense. You could lift her hand, we lifted her hand, but there was a tenseness about it, showing a. muscular contraction of some degree; there were no spasms. . . . The first thing I observed about was the depressed state of the respiration, and I asked one of the ladies to bring water and a spoon and I hastily prepared a hypodermic injection of atropin which is a stimulant of the respiration, and that was given to her, that hypodermic, but before that was given Dr. Carter arrived and was asked, his judgment was asked. . . . Just before she died we gave her another hypodermic containing some strychnine and atropin."

He said further that she was completely unconscious when he came; that there were no volitional movements; that there was considerable froth at the mouth moving in and out with the breath; the blood vessels of the face were engorged; the eyes fixed and pupils dilated. She died in fifteen or twenty minutes after he arrived, which was about a half hour after Dr. Buck had given the dose and injection last referred to.

The autopsy revealed the following conditions as testified to by the pathologist who conducted it:

"That the body had not been embalmed and the surface showed some decomposition, but that the vital organs, such as the heart, lungs, liver, stomach, spinal cord and intestines, were in fairly good state of preservation; that the two chambers on the left side of the heart were empty, and the two chambers on the right side contained dark clotted blood; that the heart valves were normal, and the aorta in good condition.

"The pupil of the right eye was distinctly seen and was dilated; the lips were open and described an oval shape or ring; the tongue was held firmly between the teeth; the face was dark with blood, and the veins over the temples were prominent and distended and had been engorged.

"The blood had settled in the posterior part of the lungs; the omentum and covering of intestines were normal; and the appendix was normal, small and perfectly free.

"In the lower part of the pelvis he found a soft pinkish material which he took to be the decomposed uterus or womb, and in this material he found the bones of a three-months-old fetus.

"The kidneys were decomposed, the entire uterus, the right Fallopian tube, both ovaries had decomposed and could not be found; they had broken down and gone into liquefaction; the left Fallopian tube remained but showed some decomposition.   .   .   .   The dark, clotted blood in the right side of the heart, with the absence of clots in the left side, indicated that there had been a disturbance of the respiration immediately before death."

The chemical analysis showed that:

"Sulpho-cyanide was present in all the jars of viscera except one, and that one contained the liver and showed the presence of cyanide, as distinguished from sulpho-cyanide; the stomach showed the strongest reaction of sulpho-cyanide; the quantity of sulpho-cyanide in the brain was ten times as great as in the normal human being; he also found strychnine in the quantity he expected, it having been given hypodermically before death, and for that reason he made no attempt to determine its quantity accurately and he regarded its

presence important as proving the correctness of the analysis; he (the chemist) also found other alkaloid poisons whose individual chemical identity he did not determine, but in whose class he placed ergot and cotton root; and he did not believe that ergot and cotton root could be definitely identified in a body after death."

The chemist also testified: that if hydrocyanic acid had been administered before death he "would expect to find sulpho-cyanide in the body, and if there had been some in the body in the natural condition, the amount would be increased by this decomposition of the cyanide, and if there was none in the body at all before it ought to show up in the body in the form of sulpho-cyanide after the hydrocyanic acid had been given."

On the afternoon in which the death occurred Dr. Buck was seen by the druggist coming from behind the corner of the prescription case in the drug store. He asked for a bed pan. The druggist inquired if Lelia (his wife) was worse. He said "Yes, she is very bad. I just had the doctors over there a few minutes ago," and that they had decided she had inflammation of the stomach and bowels. On that evening he told Mrs. Buck's father that he thought the cause of her death might have been the bursting of an abscess. The next morning he said to another person that it was inflammation of the stomach and bowels. He inquired of the doctors he had called in consultation, right after the death, if they supposed she could have had an abscess that ruptured a blood vessel, that she had told him that afternoon that something hurt as though she had been stuck with a knife. To another person a few weeks before the trial he said that his wife's death had been expected for some time. When a post-mortem examination was suggested by the consulting physicians he said that it was out of the question.

The brother and sister of Mrs. Buck who had seen him give his wife doses of the thick dark fluid referred to, having testified that it had a strong disagreeable

smell, were asked to describe the odor, which they could not do. A preparation the same as that described in the prescription for ergot, cotton root and sulphuric acid was then produced, and having smelled it, they were allowed to testify over objections that the smell was the same as that of the liquid so administered to Mrs. Buck.

As a reason for the speedy funeral Dr. Buck said that his wife had told him that she had a horror of having her body embalmed, and he wanted her buried as soon as possible because he wanted her to look as well as possible.

The doctors who had been called in consultation, and two others who were witnesses for the appellant, assisted in the autopsy. One of the last-named doctors was given parts of the viscera for examination.

Each of the doctors present at Mrs. Buck's death, after stating what he saw and what took place at that time, was allowed to testify, over appellant's objection, that based upon the symptoms then observed it was his opinion that she died an unnatural death. A hypothetical question was framed embracing the material facts which the evidence tended to prove concerning the age, health, symptoms, treatment, sickness and death of Mrs. Buck, and the pathologist was asked to consider such facts in connection with the facts revealed at the post-mortem examination to which he had testified, and to state what in his opinion caused her death. An objection was made that the question invaded the province of the jury, but it was overruled. The answer was that she died from cyanide poison. On cross-examination it was admitted that there might be a cause of death which the history of the case or the post-mortem examination would not show after the decomposition had advanced to a considerable extent, and that he could not positively say from his findings that death was caused by hydrocyanic poisoning.

The theory of the defense appears to be that death

may have been caused by the rupture of a Fallopian tube or extra-uterine pregnancy. The defense produced two physicians who qualified as experts and testified, in answer to hypothetical questions, that in their opinion the woman died of extra-uterine pregnancy.

The opinion of the court was delivered by

BENSON, J.: It is contended that the information is not sufficiently direct and certain wherein it charges poisoning by the administration of "cyanide of potassium and hydrocyanic acid, and *also other drugs and poisonous substances to this county attorney unknown.*" It is argued that allegations such as the one italicised are allowed only upon the ground of necessity, and that the necessity did not exist in this case because the results of the autopsy were known before the information was filed.

"It is sufficient to allege that a murder was committed in some way and by some means, instruments and weapons to the grand jury unknown, when the circumstances of the case will not permit of greater certainty of statement." (Wharton on Homicide, 3d ed., § 563; *Commonwealth v. Webster,* [5 Cush.] 59 Mass. 295; *Olive v. The State,* 11 Neb. 1, 7 N. W. 444.)

The information was good upon its face. There was no evidence (if that were admissible) that the county attorney had knowledge of the names of other drugs and substances designated as unknown, and the court instructed the jury that under the evidence a verdict of guilty could not be returned unless cyanide of potassium or hydrocyanic acid was administered. It can not be held either upon the face of the information or the evidence that the charge was fatally defective. Even where the giving of one kind of poison is alleged, and another kind proven, the indictment is maintained for the kind of death is the same. (2 Hale's Pleas of the Crown, 185; 2 Bishop's New Criminal Procedure, § 514.)

Complaint is made of the admission of the declaration of Mrs. Buck that the doses given to her by the appellant in the last three days of her life burned her stomach. These exclamations of present pain and suffering were accompanied by a wry face, sudden sickness, and vomiting, and were admissible within the principles stated in *Betterment Co. v. Reeves,* 77 Kan. 111, 93 Pac. 627, and 3 Wigmore on Evidence, §§ 1718, 1719.

It is contended that there was error in allowing the brother and sister of the deceased to testify concerning the doses of dark thick liquid causing nausea referred to above, and especially in admitting evidence by comparison of odors tending to prove that this consisted of ergot and other drugs. These doses were administered by the appellant himself at intervals for two days preceding the day of her death, at times when, to ordinary appearances, she was not greatly indisposed. The acts of the appellant in this sequence of events were admissible as parts of a connected transaction. It is suggested that this testimony tended to prove a crime different from the one charged, but even if it did that would be no reason for its exclusion if it also tended to prove the charge of poisoning, or to show intent or motive. It is sufficient if the testimony is referable to the point in issue or tends to exhibit the *res gestæ* or to establish a chain of circumstantial evidence in respect to the act charged. (*Lewis v. The State,* 4 Kan. 296; *The State v. Adams,* 20 Kan. 311, 322; *State v. Ames,* 90 Minn. 183, 96 N. W. 330; *People v. Harris,* 136 N. Y. 423, 33 N. E. 65.)

The testimony of the druggist that appellant requested him not to file the prescription presented and filled on August 23 is not too remote in connection with the treatment administered afterward and the attendant circumstances. Evidence tending to show the poisonous effects of ergot in large doses or in repeated small doses was properly received to show the prop-

erties of the drug. This tended also to answer the suggestion of the appellant that the testimony was offered to prove another offense.

An interesting question of evidence is presented upon the comparison of odors. A compound the same as that prescribed by Dr. Buck on August 23 was prepared during the trial, and witnesses who had noticed the smell of the doses given to Mrs. Buck were requested to smell of this compound and were asked how the odor compared with that of the doses so given, and whether the smell was the same. It is insisted that the admission of this testimony was erroneous. How may an odor be described by a witness and communicated to the jury? Wharton says: "Opinion, so far as it consists of a statement of an effect produced on the mind, becomes primary evidence, and hence admissible whenever a condition of things is such that it can not be reproduced and made palpable in the concrete to the jury. Eminently is this the case with regard to noises and smells." (1 Wharton's Criminal Evidence, 10th ed., § 459.) If one is asked to describe an odor the answer ordinarily is by comparison, for example that it was like vinegar, or smoke, or other article supposed to be familiar or better known. In *Conner v. The State,* 6 Tex. App. 455, evidence of a witness that he smelled chloroform in a room was held admissible although the objection here made was not discussed. Similar rulings have been made respecting the smell of spirituous liquor, extending even to vomit wherein the odor appeared. (*Marschall v. Laughran,* 47 Ill. App. 29.) The principle upon which such evidence is allowed is stated in *State v. Shinborn,* 46 N. H. 497, that is:

"On the ground that it came within that class of cases where evidence is received from necessity, arising from the impossibility of stating those minute characteristics of appearance, sound, and the like, which, nevertheless, may lead the mind to a satisfactory conclusion, and be reasonably reliable in judicial

investigations.   Among instances of this class, form-
ing an exception to the general rule, is the proof of
identity in a great variety of cases; such as the identity
of person, handwriting, animals, and inanimate ob-
jects; and so where the identity is detected by the ear,
or by the sound of the human voice, of a musical
instrument, the discharge of a pistol, and the like.
.   .   .   In these and an infinite variety of other cases,
the conclusion is drawn from evidence addressed to the
eye or ear or both, and which, from its very nature,
can not be described to another." (p. 501.)

The same reasoning applies here.   Although sight
may be considered more reliable, evidence afforded by
other senses is not excluded. (17 Cyc. 81.)   Its
weight must be left for the jury.

Hypothetical questions addressed to professional
witnesses were objected to on the ground that they in-
vaded the province of the jury.   A question to Dr.
Trimble, a pathologist, after including a statement of
material facts which the evidence tended to prove, con-
cluded with the following:

"Q.   Considering that these were her symptoms and
conditions on Saturday, Sunday and Monday, imme-
diately prior to her death, and considering further in
the same connection that the facts revealed by the *post-
mortem* examination were those testified to by you
to-day, have you an opinion as to what caused her
death?"

In support of an objection to this question it is said
that an expert witness can not be permitted to testify
to a matter which is directly in issue; that the judg-
ment of witnesses can not be substituted for that of the
jury.   If this be the rule it has no room for operation
here.   The issue to be decided was whether the death
of Mrs. Buck was caused by poison administered by
the appellant.   To sustain the charge the state was re-
quired to prove the fact of death by poison, but that
alone would not prove the guilt of the accused.   It must
also be shown that he gave the poison.   It seems to be
argued that while the witness might properly give his

opinion as to what *could* or *might* have been the cause of death, it was error to allow him to say what the cause really was. This distinction made by some courts was referred to in *Commercial Travelers v. Barnes,* 75 Kan. 720, 90 Pac. 293. Comments on this question in that opinion are deemed pertinent but repetition is not necessary here. A question asking for an opinion upon the cause of death based upon a given hypothesis or upon personal knowledge of the conditions, or both, is one that a properly qualified witness may answer. (*The State v. Hatch,* 83 Kan. 613, 112 Pac. 149; *Simon v. The State,* 108 Ala. 27, 18 South. 731; *Everett v. The State,* 62 Ga. 65; *State v. Smith,* 32 Maine, 369; *Eggler v. The People,* 56 N. Y. 642; *Commonwealth v. Crossmire, appellant,* 156 Pa. St. 304, 27 Atl. 40; *Gran v. Houston,* 45 Neb. 813, 64 N. W. 245; Rogers on Expert Testimony, 2d ed., p. 49.)

Brief criticisms of opinions holding otherwise, based upon the distinction between what caused and what *might* or *could* have caused death, will be found in 5 Wigmore on Evidence, under section 1976.

Objections to other hypothetical questions asked by the county attorney are sufficiently answered by what has just been said.

On cross-examination a hypothetical question was asked embodying only a part of the facts and symptoms embraced in the question asked by the state, and an objection that the hypothesis did not include all the material facts in evidence was sustained—we think erroneously. Great latitude is allowed in such cases to test the intelligence, discernment and capacity of the witness, that the jury may determine the value of his testimony. (*The State v. Reddick,* 7 Kan. 143.) To this end it has been said that questions may be asked leaving out facts assumed on direct examination. (2 Elliott on Evidence, § 1124.) A careful examination of the abstracts, however, has convinced the court that no prejudice re-

sulted from this ruling, since upon the whole cross-examination, conducted at great length, the witness testified upon the matters in detail embraced in the question, and admitted that he did not know whether death would have been possible from hydrocyanic poisoning without any of the symptoms named. Error in such rulings is not necessarily fatal. The statute provides:

"On an appeal, the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties." (Crim. Code, § 293.)

The court in substance instructed the jury that a verdict of guilty could not be returned unless they found that cyanide of potassium or hydrocyanic acid, or both, were actually administered by the defendant, knowingly and willfully, with intent to take the life of Mrs. Buck; that these substances were poisons; and that the deceased came to her death by means of one or both of these poisons, or by means of one or both of them and also ergot or cotton root or both. Error is alleged because the court did not in this connection inform the jury that it was necessary to find that ergot or cotton root were poisons, nor direct them in what manner the evidence relating to these substances should be considered. The effect of ergot or cotton root alone is not very important if one or both of the preparations of cyanide, taken alone or together with these drugs, caused death; and the court stated that unless cyanide in one of the forms named was given there could be no conviction. If there was any error in these instructions it is one of which the appellant has no cause to complain.

An objection to the verdict because it did not state the kind of poison is without merit. Such a finding is not required.

It is argued that the evidence was insufficient to convict. This argument is based largely upon the fact

that only a trace of cyanide was found in the body, and that the pathologist produced by the state testified that death might have resulted from other causes.

The failure to produce further proof of the finding of cyanide in the body, although sulpho-cyanide, as we have seen, was found in excess quantities, is accounted for by the decomposing process referred to in the statement. The possibility that death resulted from some other cause did not require an acquittal if upon all the evidence the jury were satisfied of his guilt beyond a reasonable doubt. (*Cox v. The People*, 80 N. Y. 500, 516.) Neither is proof of motive indispensable when the jury is so satisfied of guilt without it. (*The State v. Dull*, 67 Kan. 793, 74 Pac. 235.)

There was competent evidence tending to prove every material fact necessary to support the charge. A further review of the evidence would necessarily be lengthy and is believed to be unnecessary. The verdict approved by the district court must stand.

The judgment is affirmed.