No. 31,891

THE STATE OF KANSAS, *Appellee,* v. JOHN OLTHOFF, *Appellant.*

(40 P. 2d 384)

Opinion filed January 26, 1935.

*T. S. Salathiel, John Bertenshaw, Kirke C. Veeder,* all of Independence, and *Dexter T. Barrett,* of Denver, Colo., for the appellant.

*Roland Boynton,* attorney-general, *Warren B. Grant,* county attorney, *Richard L. Becker,* assistant county attorney, and *Thomas E. Wagstaff,* of Independence, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: John Olthoff, charged with the murder of his wife at their home in Independence the night of May 9, 1933, was tried, found guilty of murder in the first degree, and sentenced to life imprisonment. He has appealed, and complains of rulings of the trial court relating to the admission of evidence and the examination of witnesses, and contends the verdict is not supported by the evidence.

The facts disclosed by the record—as under the evidence the jury was entitled to find them to be—many of which were not controverted, may be stated as follows:

John Olthoff and Bertha Ritter, three years his senior, were married in 1911. Two children were born to them; a son, Martin,

about twenty years of age at the time of the homicide, and a daughter, Helene, a year or more younger. The parties had lived at Independence since their marriage, and all of that time Mr. Olthoff had been employed by a retail mercantile company there, his hours of work being from seven to twelve in the forenoon and from one to six in the afternoon, with one Saturday off every two weeks. It was his practice to go home for lunch. The amount of his salary is not shown. Mrs. Olthoff was an only child and inherited her parents' property, and from this she owned, at the time of her death, the bungalow in which the family lived, another one near by, which she rented, some real property in Oklahoma, and bonds and other securities of the value of about $8,000, and from her funds she had been paying the expenses of maintaining their two children in school. She personally looked after her property and managed her own financial affairs. Defendant testified that at the time of the homicide he had about $600 secreted in their home, for the reason that a year or two before he had sustained a loss by having a deposit in a bank which failed. What other property of consequence he had, if any, is not shown. The Olthoffs were of German descent, frugal and industrious. They were members and attendants of the German Lutheran church in Independence. Ever since about the time of the birth of her children Mrs. Olthoff had been in poor health. She suffered a great deal with what defendant spoke of as "female trouble." At least three major surgical operations had been performed upon her. At each of these times she was treated at the hospital several weeks before she was able to be taken home, and this was followed by a long period of convalescence, during which she gradually regained strength to do her housework, or most of it. One of these major operations was about two years before the homicide, and she had not fully regained her strength at the time of her death.

Never a demonstrative couple, Mr. and Mrs. Olthoff, to their friends and neighbors, appeared to get along together with reasonable harmony, and there is no evidence of a passionate fuss or quarrel between them. For three years prior to the homicide they had not occupied the same bed. For some months, perhaps a year and a half, prior to the homicide defendant had been paying some attention to and spending some of his spare time with a widow, Mrs. Stucker, who worked in a store around the corner and a few doors from the store in which he worked. The rear of the two

stores came near each other at the alley. Frequently defendant would hurry through his lunch at home, get in his car, go to Mrs. Stucker's house, or near there, have her get into the car, and take her to the store where she worked, or within a few doors of it. He also took her riding in the evening—about town, to the country, where they pleased to go. Defendant did not tell his wife about these things and she learned of them slowly, if at all. She did notice his absences from home and his increasing lack of interest in his home and family. She mentioned these matters to him; he was provoked that she did so. On some occasions, on trips with his family, defendant invited Mrs. Stucker to go with them, which she did. One of these trips was to Longton, another to Tulsa; perhaps there were others. Mrs. Olthoff wondered why her husband invited this other woman to go with them. She mentioned that to her children, and to her husband. He did not quarrel with her, but "went out to the garage to cool off." He got to spending his week-ends away from home, every two or three weeks, on "fishing trips." His wife did not like that, but he went. On one occasion, when he was preparing to go on one of these trips, she "took him to task" for leaving his family and spending so much of his spare time away from home, and insisted on knowing where he was going and whom he was going with. He told her he was going to Niotaze, a town in an adjoining county, with a Mr. Wilson, near Schoen-feldt's garage. She wrote these words—"Niotaze, Wilson, garage by Schoenfeldt's"—on a card, which she put in the cupboard. Her reason for doing this, as she explained to her daughter, was to be able to locate him if anyone called for him while he was away. It is conceded that on this occasion he willfully falsified to his wife about where he was going, and with whom. Instead of doing as he told his wife, he took Mrs. Stucker with him in his car, drove to Coffeyville, where they stayed and had sexual intercourse at a cottage camp. The next day, Sunday, he brought Mrs. Stucker to her home at Independence, and without going to his own home on that day drove south into Oklahoma, where he stayed until the next Thursday, when he came home. He testified the first day he was in Oklahoma he "fished some." What he did the remainder of the time is not disclosed. He was out with Mrs. Stucker on other occasions, and on at least one other occasion stayed with her and had sexual intercourse with her at a cottage camp in another town. These liaisons continued up to the time of the homicide, perhaps later.

Defendant, also, within the few months prior to the homicide, made himself obnoxious to some of the young ladies of the town by inviting them to ride with him at times and under circumstances which indicated rides or trips for immoral purposes. These he repeated several times, and to as many as three young ladies, with whom he had only a passing acquaintance, although each time his invitation was firmly declined.

The home occupied by the Olthoffs at the time of the homicide is of the bungalow type. It faces west on Sixteenth street, paved thirty feet wide with brick. It sits back from the street about twenty feet. There is a grassed yard in front, but no sidewalk along the street. North and east of the house a short distance is a flower bed about seven by nine feet, which had been spaded up preparatory to planting, the ground of which was loose and dry. South of the house a few feet is an east-and-west alley, sixteen feet wide, surfaced with gravel. North of the house, about forty feet, is the other bungalow owned by Mrs. Olthoff, situated on the same lots, facing north on Laurel street, the bedroom being at the south. It was then occupied by O. G. Griffin and family. These two houses, with their yards and appurtenances, occupy the space for half a block along Sixteenth street from Laurel street south to the alley. Between the two bungalows is a cement driveway from Sixteenth street east to a double garage near the east line of the lots. This driveway is widened to the south, so as to permit a car to stand just north of the middle and front portion of the Olthoff house. Across the south half of the front of the Olthoff house is a porch, eight by fourteen feet, partially extending into the house proper; back of that is the living room; back of that the bathroom, with approaching hallways, from which stairs lead to a rather low attic, unfinished, except that it is partly floored, and was used for a bedroom, occupied the night of the homicide by the daughter, Helene Olthoff; and back of the bathroom and hall is a bedroom in the southeast corner of the house, occupied that night by the son, Martin Olthoff. On the north side of the house, from the front, is first, the dining room, back of that the kitchen, about midway of the house from west to east, from about the center of the north side of which stairs lead to the cellar, and back of the kitchen is a bedroom, on the east end of the house, occupied that night by Mr. and Mrs. Olthoff. North of this bedroom is a porch, about fourteen feet long east and west and about

five feet wide, near the east end of which is a cistern. There is a door at the west end of this porch opening into the kitchen, also at the northwest corner of the porch was a screen door covered completely on the inside with an awning-like canvas attached on all sides to the framework of the screen door. This door opened outward onto four cement steps leading to the cement driveway and to the garage. Just west of these steps, and so set as partially to screen them from the street, was a trellis, perhaps five feet high, made of galvanized pipe. This extended out from the side of the house, perhaps three feet. Some vines were on the trellis, but not enough to make a complete screen. It appears the family, in entering or leaving the house, ordinarily used these porch and kitchen doors. We find no evidence in the record of the use of any other means of ingress or egress at or about the time of the homicide. Between the two bedrooms above mentioned was a closet, the length of the bedrooms east and west and two and one-half feet wide, with a door opening into it from each bedroom. These doors were not opposite each other. The closet was quite well filled with clothes on hangers. The bedroom occupied by Mr. and Mrs. Olthoff, being the north one of the two bedrooms in the east portion of the house, measured eleven by twelve and one-half feet. In the northeast corner was Mr. Olthoff's bed, with the head to the north. In the northwest corner was the bed occupied by Mrs. Olthoff, with the head to the north; it appears this was a single bed. Between the beds and on the north side of the room was a commode, and on this was a jewel box in which some inexpensive jewelry was usually kept. At the southeast corner of the room was a dresser, and another one near the center of the south side of the room. Just east of the center on the south side of the room was the door to the closet, and at the south end of the west side of the room was the door to the hall leading to the kitchen and to other rooms; both these doors opened into the bedroom, and were open the night of the homicide. Near the center, in the east side of the bedroom, were two ordinary sized outside windows, with screens. In the north side of the bedroom were two windows, one directly above the head of the bed occupied by Mrs. Olthoff, the other slightly east of the center of the room over the commode; these were smaller than ordinary size. All four windows were closed the night of the homicide.

The evening of May 9 the family had supper at home soon after

six o'clock. Mr. Olthoff and Martin went to the airport to see a new plane which had come in. Martin stopped to see a show; Mr. Olthoff went home; then he and Helene went on an errand and returned in about twenty minutes. Mrs. Olthoff had been watering the lawn, but came in, spoke of feeling tired—she had washed that morning—and went to her room to lie down. Mr. Olthoff sat in the kitchen reading the paper; Helene was ironing. Martin came home about ten o'clock, and soon the family retired for the night. Helene was the last to retire and just before doing so went to the cistern on the north porch for a drink, fastened the screen door by hooking it from the inside, locked the door leading from the porch to the kitchen, leaving the key in the lock, and placed a chair against the door on the inside of the kitchen. About midnight, or a few minutes after, Mrs. Griffin, in her bedroom, about forty feet north of the Olthoff house, wakeful that night because of a sick child, heard the slam of the screen door on the north porch of the Olthoff house, looked out of her window—it was a moonlight night—and saw a man, dressed in white, go away from the screen door west along the cement driveway toward Sixteenth street, at a gait she described as between a walk and a run. She called her husband, who was asleep, awakened him, and told him something was wrong over at Olthoff's. Both Mr. and Mrs. Griffin looked that way and saw the man, whom Mrs. Griffin said was the same man who a few minutes before had gone hurriedly from the Olthoff screened porch door toward Sixteenth street, now coming back along the cement driveway directly toward the screen door he had left a few minutes before. Mr. Griffin recognized the man as Mr. Olthoff. He was walking stooped forward, striking his breast with his fist as he walked, and uttering a peculiar moaning, crying sound. Mr. Griffin called him and asked: "What is the matter, John?" Mr. Olthoff then changed his direction and walked northward to near the window of the Griffin bedroom. As he walked he was talking about someone shooting, in a manner difficult to understand. Mr. Griffin understood him to say, as he neared the window: "They tried to shoot us." From Olthoff's conduct and the noise he was making Mr. Griffin thought he was shot, and asked him: "Are you shot?" Olthoff replied: "No, it's not me, it's Bertha." Bertha was his wife. Mr. Griffin then told his wife to call the police and a doctor and told Olthoff he would be out as soon as he could get dressed. Mrs. Griffin called the police, and remembering Doctor Sheppard was Mrs. Olthoff's

regular physician, suggested that she call him, and Mr. Griffin told her to do so, and Mr. Olthoff said: "Yes, call the doctor." Mr. Griffin dressed hurriedly and went out to where Olthoff was on the cement driveway between the two houses. About the time Griffin got out there two policemen came walking up the driveway. They had received the word and responded quickly. With nothing more being said, all four of the men went into the house, Olthoff leading, onto the north porch, into the kitchen, and through it into the north bedroom. Mrs. Olthoff was lying in her bed on the right side, with a bullet wound a little above her left ear. She was unconscious, motionless; her muscles were relaxed as though she had not moved after the blow of the shot. Doctor Sheppard and the coroner were there in a few minutes and saw that her injury was serious, perhaps fatal, gave some emergency treatment, called an ambulance, and had her taken to the hospital. She died about ten minutes after reaching the hospital; perhaps about 12:45. Mr. Olthoff did not accompany her to the hospital because of lack of room in the ambulance, but followed in his car. As soon as she died the doctors asked Mr. Olthoff's permission to hold an autopsy. He consented readily. The autopsy disclosed Mrs. Olthoff was shot twice, near the same place; there were powder burns about the wound; one bullet flattened out on the skull bone and did not enter the brain; the other bullet went through, destroying a large area of the motor section of the brain, and lodged in the skull on the other side. The bullets were .38 caliber. Her muscles were relaxed, as in sleep, indicating she received the fatal blow without having been disturbed; none of them were tense, as some of them would have been had she been so aroused or disturbed.

When Mr. Griffin and the two police officers went to where Mr. Olthoff was on the cement driveway and went into the house with him he was dressed in light-colored, almost white, pajamas, and was barefooted. In going from the kitchen to the bedroom they passed the daughter, Helene, in the hall. The bedroom was lighted. Blood from the wound was about Mrs. Olthoff's head and in the depression in the pillow, and some of it had splashed to the ceiling directly overhead. An officer asked Mr. Olthoff what had happened. He said some intruder came in there and murdered his wife. He was asked if he didn't have a gun around there for his own protection in a case of that kind. He replied: "No, officer, I have never owned a gun in my life, other than that old shotgun that you see

sitting there in the closet." He further stated there had been three shots fired in the room. He said the first two shots that were fired aroused him, and as he rose up a third shot was fired—someone turned a flashlight on him and fired the third shot at him. In the east wall of the room, north of the window and about eight inches above the bedclothes on Mr. Olthoff's bed, a .38 caliber bullet was imbedded in the wall, in such a way as to indicate it had been fired from near the door at the southwest corner of the bedroom. The officer could see but one wound on Mrs. Olthoff, and could account for but two shots. Mr. Olthoff insisted three shots had been fired. Although Mr. Olthoff answered the officer's questions he was non-communicative and volunteered no information. He did not go to his wife, or say anything to her. He stood about the room, or sat on the edge of his bed, his hand, perhaps a handkerchief in it, over his mouth, moaning softly. He was asked about any indications of robbery, if he missed anything. He stated he observed the top was off the jewelry box on the commode, suggesting the intruder might have taken it off in a search of jewels. Later the officers examined the top of the box for finger prints—with what result the evidence does not disclose. Someone suggested to Olthoff that he get dressed. He took his overalls from where they were hanging in the closet, and stated he had been robbed of "two pays," about $77, which he had in his purse, which also was gone from his pocket. Loose change in a pocket was not disturbed. The two officers, and others who came soon, began an intensive search of the premises for evidence an intruder had been there. They examined the interior of the house; at the suggestion of the daughter an officer examined upstairs; the outside door of the cellar was locked, no window or door was opened or bore any evidence of having been used for ingress or egress, except the screen door on the north porch and the door leading from that porch into the kitchen. The screen door had been fastened to the casing, when the family retired about ten o'clock that evening, from the inside of the porch by the common hook and staple, or eyelet, fastening, situated near the center of the height of the door. A hole was found in the screen about an inch from its edge and about the height of the hook fastening, apparently made by pushing the screen wires apart, as by an ice pick or a wire—about half the size a lead pencil would have made if pushed through the screen. Almost even with this, as to height, but farther from the edge of the screen door and more toward its center, there was

a hole in the canvas cloth fastened over the entire screen door on the inside. This hole was a little larger than the hole in the screen wire and had the appearance of having been freshly made, as with a knife; and its ragged edges and strands broken at one end hung or extended outward as though the force of making it had been applied from the inside of the porch. One from the outside, attempting to open this screen door by lifting the hook with a wire or similar instrument, would have been fortunate to have located the hole in the screen opposite the hook unless he was familiar with the location of the hook on the door casing and screen. It might have been several inches above or below. Even with a flashlight he could not have seen through the screen where the hook was, for the entire surface of the screen was covered on the inside with a heavy canvas. Had he attempted to place a wire through the hole in the screen, then through the hole in the canvas to raise the hook, the holes were so situated that the end of the wire would have been pointing away from the hook instead of toward it. It would have been a peculiarly shaped wire or instrument which it would have been possible to use through these holes to lift the hook which fastened the screen, even if one knew the exact location of the hook. Defendant testified that some months later, and before the trial, while working in the flower bed near the northeast corner of the house he found a short piece of wire bent in such a peculiar shape that he thought it possible for it to have been used through these holes to lift the hook, and he attempted to demonstrate that at the trial before the jury. The door from the porch into the kitchen was locked from the inside, the key left in the lock, and a chair placed against the door on the inside when the family retired about ten o'clock for the night. The officers found this door open, the chair pushed back with it, and the key lying on the floor under the chair. The lock of this door was of a kind in common use, which might have been opened from the porch side with a skeleton key. To accomplish this, however, it would have been necessary to get the key out of the lock, which already was in there. This, it was said, could sometimes be done by shaking the door or the doorknob. Had an intruder attempted to do that it is likely the noise of his efforts would have awakened someone in the house. It was reasonable for the jury to have concluded, as evidently it did, that both of these doors were opened by someone from within the house and not by an intruder from without.

The officers also searched for an intruder, or some evidence of one, outside the house, in the yard, through the neighborhood, at all places in or about town where tramps, sojourners, or the criminally inclined likely would be, also outgoing trains and highways. They barricaded the alley south of the Olthoff house so it could be searched better the next day. None of this disclosed any evidence of an intruder. In the dry, loose earth of the flower bed, near the northeast part of the house, was found a footprint. This was examined by flashlights, covered with a ladder, and examined the next day. It was a clearly outlined imprint of a shoe, or boot, about eleven inches long, located about ten feet directly west of the northwest corner of the house, and about six feet west of the east line of the flower bed, with the toe part of the imprint toward the southwest. It could have been made by one running from the house taking a long step into the flower bed. Perhaps it could have been made some other way. How long it had been there was not shown, nor was it definitely connected in any way with the homicide. While the officers searched for any clues they did not at first direct special search for a gun, cartridges, or shells used in the homicide, and these never have been found. In a drawer of the commode in the room where the homicide occurred were found several old cartridges or shells not recently fired—some .32 and some .38 caliber—but it is not shown these had any immediate connection with the homicide.

Defendant's story of the intruder was told at different times with variations. A cousin to Mrs. Olthoff, who was notified of the tragedy, came to the Olthoff home the afternoon of May 10 and talked with defendant, who took her into the bedroom and explained to her how it happened. She testified, when asked to state what he said:

"Well, he said he seen a dark object standing at the foot of his bed and he said slowly this dark object walked between the bed to the dresser and he lifted the jewelry box and it made a little noise and of course Bertha turned and raised on her elbow and the robber shot twice. He said then the robber went to the door and shot at him and his nerves gave way and he jumped up and followed the robber to the alley."

The witness talked with him about various phases of the matter, and had him repeat the story to her so she could remember it, which he did as many as three times, always the same, or substantially so.

To another witness he showed the hole in the bedroom wall, the key on the floor, the hole in the screen, and blood spots on the bed-

room ceiling, and said he saw the intruder and followed him down to Laurel street and came back and told Griffin; that the intruder had robbed him and shot his wife, and that he had seen the intruder holding a flashlight down on the floor.

To another he said he was awakened by the shot, raised up in bed and a shot was fired at him from the bedroom door; that the fellow had a flashlight down toward the floor; that he jumped out of bed, followed the fellow through the kitchen, out of the door and down the driveway to the street and to the alley south of the house, looked both ways, but saw no one, and returned and holloed for help.

To another he said he was aroused by a shot or some noise and rose up on his elbow and "that fellow took a shot at me and hit the wall;" that he saw the form of a man standing at the foot of his bed and that the man took money from his overalls hanging on the closet door.

On this point defendant, at the trial, testified that after they retired for the night he went to sleep; his next conscious moment was when the shots were fired.

"There were two at first which were close together, something like 'bang-bang,' then a few moments later there was a third one, fired from near or about in the entrance that goes to the kitchen. I could see a light from the flashlight onto the floor, pointing down on the kitchen floor about by the door post."

That he was in bed when the third shot was fired, and not fully awake, but was getting up, excited and without a clear conception of what was going on; that as quickly as he could come to himself and realize enough to get up he started through the bedroom toward the door, feeling his way out and into the kitchen, over to the kitchen door and onto the porch, out of the screen door; that he looked between the garage and the porch to see if anyone was there and then started down the driveway toward the west, where his car was, and looked back of the car to see if there was anybody hid there, and not seeing anyone he started on toward the street; that he went as far as the street, but is not sure how much farther; that he looked in every direction, but saw no one.

"Then, I ran back into the house, switched on the light as I went into the kitchen and into the bedroom and turned on that light and saw where Bertha had been shot. A big bloody spot on her left side. I ran out excited over towards Griffin's door, their kitchen door, hollering for Griffins and Tuckers and Mr. Griffin answered then and said, 'What is the matter, John?' After he had hollered I ran over to his bedroom window and told him. He said, 'Well,

are you shot?' I said, 'No, Bertha is shot.' Then he said, 'Well, I will be over right away.' He said, 'Do you want me to call the doctor?' I said, 'Yes, call the doctor and the police quick,' and he asked me then which doctor. I said, 'Any doctor.' I went back then into the house and he was over then before very long."

That he then called his son Martin and his daughter Helene. He further testified that he never saw any intruder in the house, or out of the house, in any room, or any place. It was shown on rebuttal that he testified at a former trial: "I was wide awake by the time the second one (shot) was fired."

Defendant, while a witness in his own behalf, admitted his immoral relations with Mrs. Stucker, hereinbefore stated, but contended they were purely commercial in character; that he paid her each time she permitted him to satisfy his sexual desires; that his conduct was not prompted by love for her, or similar motives, nor by lack of love and respect for his wife. As tending to offset this, in part at least, there was testimony to the effect that on the evening after he had been arrested and given bond, about three weeks after the homicide, he was observed following Mrs. Stucker and seeking her company. In this connection we should state, in fairness to Mrs. Stucker, that when confronted by the county attorney with defendant's story of his immoral relations with her, she positively denied all such immoral conduct, and told a story of her acquaintance and relations with defendant and his family which was entirely consistent with such denials. Although she was not called as a witness by either party, her statements containing such denial were placed in evidence.

Word of the tragedy spread rapidly. Officers, relatives and others came to the Olthoff home. There is testimony that there was some discussion in the presence of defendant about additional investigation, and defendant said: "I won't spend no money." His brother, Henry Olthoff, who was present, spoke and said: "I will give $50 to get the dogs down here." Defendant said: "I don't want to have nothing to do with it."

About two days after the homicide defendant called the attention of his daughter to some blood spots on the right sleeve of the pajamas he wore the night of the tragedy and asked her to wash them out, which she did. There was testimony that these blood spots had the appearance of the blood having been splashed on the cloth.

A witness, to whom defendant explained what had occurred, asked

him, "Didn't you have a gun, John?" Defendant did not answer. The question was repeated, but defendant made no answer to it. A few days later, when the county attorney was interrogating the daughter about the circumstances, among other things he asked her if there was a pistol or gun about the place. She told him that there was a pistol there and the last time she had seen it was when she was putting some clothes in a dresser drawer the Christmas before the tragedy. Defendant, on being interrogated about that, said Mrs. Olthoff owned the gun, which she had inherited from her father, that it had been about the house many years, but that he had sold it about a year before the tragedy to a pawnbroker at Coffeyville. He consented to go with the sheriff to Coffeyville to see if a record of the sale could be found. They found the man to whom defendant said he had sold it, and who had operated a pawn brokerage business, then conducting a merchandise store. While in the pawn brokerage business he had kept a record required by a city ordinance of all firearms purchased. He stated he never had purchased a pistol or gun from defendant, and having later examined his records he testified that he never purchased any kind of a gun from defendant. Defendant said the man did not look like the one to whom he had sold the gun. He was unable to find the place at Coffeyville where, or the person to whom, he sold the gun. The record reported to the city official, under an ordinance requiring such reports from all dealers, did not disclose a purchase by any dealer in Coffeyville of a pistol or gun from defendant.

A witness called by defendant testified that about 11:30 o'clock the evening of May 9, while riding in an automobile on Sixteenth street past the Olthoff house, he observed what he judged to be a man standing on the step leading to the back door of the screened-in porch. He could see his head and shoulders above the top of the automobile, standing north of the house, and through the screen, but could not distinguish his features, and it may have been the defendant. There also was testimony by a young couple who had attended a dance the night of May 9 and who were walking the few blocks to the young lady's home about ten minutes after midnight. While walking west on the south side of Laurel street, having passed Fifteenth street, they saw ahead of them, perhaps one hundred feet, a man standing on the sidewalk on the south side of the street. This man crossed to the north side of Laurel street about

the middle of the block. The young couple crossed to the north side of the street and the man then turned and crossed to the south side of the street and walked west to the intersection of Laurel and Sixteenth streets. The young couple proceeded west to that intersection, where they turned north. There was a bright electric light at the intersection and they got a fairly good view of the man, who was about six feet tall, wore dark clothes and a short overcoat. They observed the man walk south on the west side of Sixteenth street to a position almost directly across the street from the Olthoff home and then turn and walk north on Sixteenth street. The young couple were married by the time of the trial and each of them testified to substantially the same facts. This could not have been far from the time the Griffins first saw defendant come out of his house, go west toward the street, and return. It may have been a few minutes before or a few minutes later. The couple who saw the man did not know him and never have seen him since. There is nothing further than what has been stated to connect him in any way with the tragedy.

Mrs. Olthoff died intestate. Defendant proceeded promptly to have himself appointed as administrator of her estate. Respecting this the evidence tends to show that while he left to his attorney the steps to be taken, he urged prompt action. In the application for the appointment, $8,000 was stated to be the approximate value of the personal estate. Defendant was appointed as such administrator, but some time after his arrest he resigned and another person was appointed as administrator.

This statement of facts necessarily omits many details. The testimony was conflicting as to some of them, and as to these we have stated the facts as the jury was entitled to believe them. Many of the facts were not controverted, and as to these the parties seek to draw different inferences. It was, of course, the function of the jury and the trial court to weigh the evidence, pass on the credibility of the witnesses, and to determine the proper inferences to be drawn and conclusions to be found from the evidence. Some further facts may be stated in discussing the legal questions presented, which we now proceed to do.

Appellant first contends that the court erred in permitting to be asked and answered a certain hypothetical question respecting what would be indicated by the fact that Mrs. Olthoff's muscles were fully relaxed at the time she received the fatal blow of the shot.

Doctor Sheppard, the first physician to reach Mrs. Olthoff's bedside, found her unconscious, but breathing. She was lying on her right side, her muscles fully relaxed, as though she were in quiet sleep. Doctor Hudiburg saw her just a few minutes later and testified to the same fact. Both of these physicians and Doctor Hughbanks, the leading physician and surgeon at the hospital, again examined her at the hospital and found, among other things, that all her muscles were fully relaxed. They not only examined her, but later held an autopsy. Doctor Hughbanks, whose qualifications as a physician and surgeon were conceded, was asked if a shot, such as the one found, were fired into the head and brain of a person at a time when such person's entire muscular system of the body was relaxed, would he expect the muscles to continue to be relaxed, or to be rigid. He answered:

"Due to the marked amount of destruction of the brain there should be no reflex action of the muscles, and they would remain in the condition in which the patient was when they were shot."

No serious objection was made to this question and answer. This further question was asked:

"Assuming that a person should be suddenly disturbed out of a sleep by some extraordinary excitement or something, would you expect the muscles to become rigid or remain relaxed?"

Over defendant's objection the witness was permitted to answer, and said:

"Not all the muscles will become rigid; an individual will naturally go into protection, and those muscles to protect themselves will become rigid."

Appellant contends this was an improper hypothetical question, and the answer should not have been received. The point is not well taken. A party may propose a hypothetical question, not only for the purpose of bringing out his theory respecting the matter, but to develop an answer against the theory of the opposite party. (See *Commercial Travelers v. Barnes*, 75 Kan. 720, 90 Pac. 293; *State v. Buck*, 88 Kan. 114, 127 Pac. 631; *State v. Elftman*, 116 Kan. 214, 226 Pac. 795.)

Appellant next contends the court erred in admitting in evidence the testimony of the three young ladies to the effect that defendant invited them to take rides with him, at times and under circumstances which indicated his motives were immoral. It was the state's theory that defendant had grown tired of his wife, whose long and serious illness rendered it impossible for her to satisfy

his sexual desires, and that he was turning to or seeking other persons with whom he might consort more to his pleasure. This testimony fitted in with other evidence tending to establish that view. We think it was competent.

Appellant complains that the court permitted counsel for the state to cross-examine one of its own witnesses, Helene Olthoff, daughter of defendant and Mrs. Olthoff. The tide of events had placed her in an exceedingly embarrassing position. When questioned by the county attorney, while he was investigating the homicide, she was frank to state what she knew. The county attorney regarded her information important, and had used her as a witness for the state on the preliminary examination and on the former trial of this case, when there had been a hung jury, and her testimony was in harmony with her statement previously made. When called as a witness on the trial from which this appeal is taken she had not testified long until discrepancies appeared on material matters compared with her former testimony. Perhaps these were occasioned by the fact that for a few weeks directly prior to the last trial she had been living at home with her father. But whatever the reason, more of such discrepancies developed. The county attorney advised the court he was taken by surprise by the testimony the witness was giving and asked permission to cross-examine her. After being advised of the testimony formerly given by the witness the court granted the county attorney's request. In the course of this cross-examination the witness reluctantly admitted the facts were as stated by her in her former testimony. There was no error in the court's ruling permitting this cross-examination. Indeed, any other ruling would have been erroneous.

Complaint is made that the court unduly restricted the cross-examination of this witness by defendant's counsel. He sought to bring out matters not referred to in the direct examination, some of which were wholly immaterial, and the state's objections were sustained. The court advised defendant he would be permitted to call her as his witness, and if this were done she would be permitted to testify to any material matter. Defendant later called her as a witness and she was permitted to testify to all matters concerning which she was interrogated. There was no error in the court's ruling in this respect.

Appellant argues the evidence is insufficient to support the verdict. We shall not restate the evidence, and need only to point out

that it is not only sufficient, but rather overwhelmingly established: (1) That Mrs. Olthoff was murdered; (2) that the kitchen door and porch screen door were opened from the inside, not from the outside; (3) that defendant is the only person who could have murdered her, since he and the two children were the only persons in the house, and no suspicion of blame is attached to either of the children; (4) that defendant's right hand and arm were over or near his wife's head when the bullet crashed into her brain and splashed blood to the ceiling and upon the sleeve of his pajamas; (5) that he had at least two motives which may have prompted his act—(a) to acquire half of her property, apparently considerably more than his own, which he promptly took steps to do; (b) his wife's illness, which made it impossible for her to occupy his bed, or satisfy his sexual desires, a satisfaction he was finding, or looking for, elsewhere, and which he could do. with less notoriety and less trouble if his wife were out of the way. We are aware it is not every married man who is immoral with other women who has a desire to get rid of his wife—some are more attentive and gracious to her. But that was not true with this defendant; he became more neglectful, sullen and determined. There is an abundance of evidence to sustain the verdict.

On this point appellant cites and largely relies upon *People v. Lamson* (Cal.), 36 P. 2d 361. Several distinctions between that case and this might be pointed out. We will mention but three of them: (1) There defendant's story of the tragedy was at all times consistent and was found to be accurate in every detail capable of being checked; here defendant told the story differently every time he related it, and many details of it were controverted by the testimony of witnesses apparently trustworthy. (2) There the principal controverted question was whether defendant's wife was murdered, or whether her death resulted from an accidental fall; here there is no question about the fact that the wife was murdered —even the evidence of defendant establishes that fact. And (3), in that case, the supreme court of California appears to have weighed the evidence and exercised an independent judgment as to the credibility of witnesses; in this state it is not the practice of this court to do that—we examine the evidence only to see there is sufficient competent evidence to support the verdict. In this case we find an abundance of such evidence.

Finally, appellant contends he was hurried too much in presenting his motion for a new trial. The verdict was returned February 10, 1934, and the motion for a new trial was argued and ruled upon February 16, six days later. He contends the time was insufficient to enable him to get affidavits in support of some of the grounds of the motion, but he does not tell us what grounds of the motion it would have been possible to have supported by affidavits, or what affidavits, if any, could have been procured. There is no showing of error on this point. Trial courts usually are in better position to consider a motion for a new trial soon after the trial is had than weeks or months later, during which many other cases have been tried by them. Appellant's suggestion that the motion was overruled *pro forma* seems inconsistent when we are told the court heard his attorneys for as long as they wanted to argue, which was about two hours.

Considering the nature of this case, the legal questions presented may be classified as being quite trivial, although no doubt they are the most formidable appellant's counsel found to present. No contention is made that evidence properly admissible was excluded, except as to one question, the answer to which already was in evidence and concerning which there was no dispute. Neither are any objections made to the court's instructions, nor any contention made of misconduct on the part of the jury, the prosecuting attorney, or the trial court. It seems clearly to appear that defendant had a fair trial and that a just result was reached.

There is no error in the record, and the judgment of the court below is affirmed.